THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NATHANIEL BELL, Defendant-Appellant.

Second District    No. 80-649

Opinion filed March 30, 1982.

Mary Robinson, of State Appellate Defender's Office, of Elgin, and Richard E. Steck, of Chicago, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Nathaniel Bell was charged by information with the murder of Sharon Hendriex in violation of section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2)). The court refused to quash his arrest and to suppress the evidence against him. On June 25, 1980, a jury in Winnebago County found the defendant guilty as charged. He was sentenced on August 7, 1980, to a term of 40 years in the State penitentiary.

The defendant appeals the denial of his motion to quash the arrest and to suppress evidence, particularly the testimony of David Bunch, an

eyewitness to the homicide. The State contends that even assuming defendant would be correct that he was arrested without probable cause, nonetheless the trial court was correct in refusing to suppress the testimony of this witness.

At approximately 2 a.m. on March 22, 1980, Sharon Hendriex met her death in a parking lot in Rockford, Illinois, as a result of a gunshot wound. Also with her and injured was her infant daughter. Police observed a light-over-dark car pull away from the incident. They were unable to identify the occupants or make of the vehicle. The defendant resided approximately 15 blocks from the incident. Bell and the decedent maintained a relationship, Bell having fathered two of her children including the infant found at the scene. The relationship was evidently marked by a history of arguments and threats by Bell. A week before, Bell had beaten and locked the decedent in his home. Three friends of the decedent who lived near the parking lot gave statements. One stated that she saw a male Negro with a short afro and wearing a white or light blue suit kicking the decedent's car about 20 minutes before the shots. One of the other witnesses also saw a male Negro of medium build in the parking lot and a car with a white top and blue or black bottom pull away. Two of these friends indicated that earlier the decedent had expressed a fear of Bell and had gone into the parking lot to investigate who was kicking her car. Another witness gave a statement that decedent had sued Bell for child support and that Bell had, several days before, hurled epithets at decedent in the courthouse.

Arresting officers pursuant to an "attempt to locate" directive issued by the officers investigating the death located Bell at his home. He responded with his name and upon entry into the home the officers stood him against the wall. He was taken to the police station and was given his *Miranda* warnings at approximately 6:30 a.m. In the home at the time of the arrest was Berlinda Clark, who was taken to the police station for a statement. She told police that a "Dave" had accompanied Bell on that evening. Later in the morning officers inquired of Bell as to the identity of "Dave." He supplied the surname "Bunch." Up to that time Bell had refused to identify "Bunch" as he did not want to implicate his friends. Subsequently, Bell made oral and written inculpatory statements, which were not introduced at trial. The only direct evidence linking Bell to the homicide was the testimony of Bunch as to the events that occurred in the parking lot. The other evidence adduced at trial concerned the relationship between Bell and the decedent.

David Bunch upon being called into the police station was hesitant to make a statement. His attorney was brought in and after consultation with police the attorney advised Bunch that he was only a witness and advised

him to make a statement. Bunch's attorney remained with him while this statement was taken.

Bell contends on appeal that his arrest was without probable cause and should have been quashed, that the police came upon David Bunch as the result of this illegal arrest, and that therefore the State should have been precluded from the use of his testimony at trial. *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

It is the State's position that the analysis applied in *United States v. Ceccolini* (1978), 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054, compels a decision that the testimony of David Bunch was properly admitted.

■■ In *Ceccolini* the Supreme Court ruled that in an analysis of the fruit of the poisonous tree doctrine, testimonial evidence of a live witness is considered different than other types of evidence. The court quoted *Smith v. United States* (D.C. Cir. 1963), 324 F.2d 879, 881-82, *cert. denied* (1964), 377 U.S. 954, 12 L. Ed. 2d 498, 84 S. Ct. 1632:

> " 'The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.' " *United States v. Ceccolini* (1978), 435 U.S. 268, 277, 55 L. Ed. 2d 268, 277, 98 S. Ct. 1054, 1060.

■■ The Supreme Court set forth a series of factors to be considered in determining whether a live witness' testimony is to be admitted despite the illegality that preceded the discovery of the witness. Foremost, the court said the degree of free will exercised by the witness in deciding to talk to police is not irrelevant. This is true whether or not the witness is a putative defendant but it is especially true if the witness is not. In determining whether the decision to talk is an exercise of free will a court should consider the time, place and manner of the initial questioning of the witness. Another important consideration which differentiates live witness testimony from typical documentary evidence is that to exclude the testimony of a witness "would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search of the evidence discovered thereby." *United States v. Ceccolini* (1978), 435 U.S. 268, 277, 55 L. Ed. 2d 268, 278, 98 S. Ct. 1054, 1061.

■■ The enormous "cost" to the government in the suppression of such testimony was referred to in the case of *Michigan v. Tucker* (1974), 417 U.S. 433, 450, 41 L. Ed. 2d 182, 196-97, 94 S. Ct. 2357, 2367, where the

court, dealing with the trial testimony of a witness whose identity was disclosed after inadequate *Miranda* warnings, stated: "[W]hen balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce." In *Ceccolini* the court further stated, "[S]ince the cost of excluding live-witness testimony often will be greater [than excluding typical documentary evidence], a closer, more direct link between the illegality and that kind of testimony is required." 435 U.S. 268, 278, 55 L. Ed. 2d 268, 278, 98 S. Ct. 1054, 1061.

We must examine the testimony and determine if it was "sufficiently unrelated to or independent of the constitutional violation" (435 U.S. 268, 278, 55 L. Ed. 2d 268, 278, 98 S. Ct. 1054, 1061) to be properly admitted.

■■ Though certain factors present in *Ceccolini* are not present here, *i.e.*, a four-month lapse of time before questioning and an eagerness on the part of the witness to talk, of critical importance to us was role of the witness' own lawyer, who stood by with Bunch while he made his statement. It was apparent that Bunch was not a putative defendant. Under these circumstances, though there was initial hesitation by Bunch, his statement appeared voluntary.

■■ There is also the likelihood that the police would have discovered the witness *sans* the defendant's arrest. The defense contends that had the State raised the matter at trial it would have been required to prove that it would have discovered the evidence from an independent source. (*People v. Sampson* (1980), 86 Ill. App. 3d 687, 408 N.E.2d 3.) This was, however, not an inanimate object but a live witness, and as stated in *Ceccolini*, "Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition." (435 U.S. 268, 276, 55 L. Ed. 2d 268, 277, 98 S. Ct. 1054, 1060.) Once the fact of the death of Sharon Hendriex became known it is not inconceivable that David Bunch would have come forward.

The importance of Bunch's testimony is very great. Besides the defendant himself, he is the only witness to directly connect the defendant with the homicide. Consequently it can be seen that the cost of the loss of this live-witness testimony would indeed be substantial.

Chief Justice Burger stated in his concurring opinion in *Ceccolini*:

"[I]t strikes me as evident that the permanent silencing of a witness—who, after all, is appearing under oath—is not worth the high price the exclusionary rule exacts. Any rule of law which operates to keep an eyewitness to a crime—a murder, for example—from telling the jury what that person saw has a rational basis roughly

comparable to the primitive rituals of human sacrifice." 435 U.S. 268, 285, 55 L. Ed. 2d 268, 283, 98 S. Ct. 1054, 1065.

Though we do not necessarily agree with the Chief Justice's analogy, to those who criticize the game-like atmosphere surrounding the exclusionary rule the exclusion of David Bunch's testimony would be the ultimate in gamesmanship.

Considering the factors as promulgated in *Ceccolini* we are of the opinion that there is sufficient attenuation of this testimony from the assumed illegal arrest to warrant its admission.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

VAN DEUSEN and UNVERZAGT, JJ., concur.