[S.F. No. 24311. July 8, 1982.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
ALFRED RICHARD SOSA et al., Real Parties in Interest.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Gary A. Binkerd, Deputy Attorneys General, for Petitioner.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and Arnold T. Guminski, Deputy District Attorneys, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Kenneth M. Wells, Public Defender, Ernest F. Winters, Winters & Karabinus, William J. Owen, de la Vergne & McMurtry, James V. de la Vergne and Katherine Mader for Real Parties in Interest.

OPINION

**BROUSSARD, J.**—The People seek review pursuant to Penal Code section 1538.5, subdivision (o), of a trial court order suppressing the

statements and anticipated testimony of witnesses Gonzales, Lara, and Maddox in the pending trial of defendants (real parties in interest) for conspiracy to murder and the murder of Ellen Delia.[1] Our opinion upholding the trial court follows closely the reasoning of the opinion prepared by Justice Blease for the Court of Appeal.

Suspecting that defendant Michael Delia and other members of the Mexican Mafia prison gang were implicated in the killing of Ellen Delia, Monterey Park police began surveillance of the Delia residence. When Armando Varela and defendant Alfred Sosa drove to that residence, the surveilling officers detained them, discovered a gun in the car, and arrested Varela and Sosa. The trial court found, however, and the People now concede that the detention and arrest were illegal, a subterfuge to permit the police to question persons visiting the Delia residence.

Officers of a special Prison Gang Task Force interrogated Varela over a period of five days, ignoring his request that questioning cease until he could consult an attorney. Finally, when a former gang member told Varela that the gang planned to kill him, Varela agreed to provide information to the police. After further interrogation Varela indicated that Gonzales was involved in the Ellen Delia killing and showed the police where Gonzales lived. The police then prepared statements for Varela's signature and used them to obtain a warrant to search Gonzales' residence. The trial court found that the warrant—the product of the illegal arrest and interrogation of Varela—was unlawful.

Carrying the invalid warrant, the police broke into Gonzales' home and arrested Gonzales. On the way to the police station, one officer threatened to harass Gonzales and his family unless Gonzales agreed to cooperate with the police; on booking, another officer attempted to interrogate Gonzales in violation of the arrestee's *Miranda* rights. The following day, Gonzales agreed to assist the police investigation of the Delia killing.

The People do not contest the trial court's finding that witness Gonzales was arrested and his home searched pursuant to a search warrant

---

[1]In separate petitions filed with the Court of Appeal, defendants challenged orders denying the suppression of other evidence in this case. The Court of Appeal upheld the decisions of the trial court denying suppression. (*Hernandez v. Superior Court* (1980) 110 Cal.App.3d 355 [185 Cal.Rptr. 127]; *Delia v. Superior Court* (June 24, 1980) 3 Civ. 18713.)

based entirely on the illegally obtained statement of Armando Varela. They argue, however, that the link between Gonzales' statements and anticipated testimony and the illegal conduct is sufficiently attenuated to dissipate the taint of the illegality.[2] The People also seek an opportunity to show that attenuation occurred subsequent to the conclusion of the section 1538.5 proceedings.

The trial court, following extensive hearings, found that no attenuation occurred—that the statements and anticipated testimony of Gonzales were the direct and suppressible fruit of the illegal police entry into and search of his residence. We agree with that conclusion and consequently approve its order barring use of those statements and testimony. ■■■ With regard to the People's request to make an additional showing of attenuation, we explain that the People may further litigate that issue only by complying with Penal Code section 1538.5, subdivision (j). That subdivision permits the People either to reopen a suppression ruling at trial if they have additional evidence and can show good cause why it was not presented at the suppression hearing, or to challenge a ruling on appeal under section 1538.5, subdivision (o).

*1. Summary of facts and proceeding below.*

We state the facts in the manner most favorable to the trial court's determination (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal. Rptr. 809, 511 P.2d 1161]), resolving conflicts in the evidence in favor of the findings below (see *People* v. *Rios* (1976) 16 Cal.3d 351, 357 [128 Cal.Rptr. 5, 546 P.2d 293]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]).

On February 17, 1977, there was a statewide meeting of the Prison Gang Task Force, a group of state and local officers investigating the activities of the Mexican Mafia and other prison gangs. Sergeant John Helvin of the Los Angeles police told the group that Michael Delia, a resident of Monterey Park, was suspected of the murder of Robert

---

[2]The People do not separately claim attenuation of the statements and anticipated testimony of Lara and Maddox. Instead, they acknowledge that "[b]ecause Lara's and Maddox's statements are derivative of Gonzales' and were ordered suppressed for that reason . . . the focus appropriately rests on Gonzales." We therefore limit our discussion to the statements and testimony of Gonzales.

Lewis. Officer Robert Morrill of the Monterey Park Police Department attended the meeting.

Ellen Delia, Michael's wife, was killed on the evening of February 17. The next day her body was discovered near the Sacramento airport. Suspecting that Michael was involved in this killing as well, Monterey Park police commenced surveillance of the Delia residence.

In the evening of February 20, defendant Sosa drove to the Delia residence and parked in the driveway. Armando Varela was a passenger in the car. Officer Joe Delia (coincidentally, a cousin of Michael Delia) testified that he detained the driver for making an illegal left turn, and radioed for back-up assistance, and that Officer Morrill arrived shortly in response to the call. Neighbors testified, however, that Sosa did not make an illegal turn and that both police cars arrived simultaneously.

Officer Delia arrested Sosa for failing to present identification, looked in the car, and saw a revolver. The officers then arrested Sosa and Varela for robbery and took them to the Monterey Park police station for booking. Although robberies had occurred in the area, the record does not provide an objective basis for believing that Sosa and Varela committed them.

While booking Sosa and Varela, Officer Morrill attempted to question them. Sosa refused to talk to Morrill, but Varela acknowledged that he was on parole. Morrill then asked Special Agent Ricardo Minjares of the California Department of Corrections to look into placing a parole hold on the arrestees.[3]

Minjares arrived about midnight and questioned Varela without advising Varela of his constitutional rights. The next day Officer O'Connor of the Monterey Park Police Department read Varela a statement of constitutional rights; Varela replied that he wanted to talk to an attorney and O'Connor terminated the questioning. He did not assist Varela in obtaining counsel.

Later the same day, February 21, Detective Steed of the Sacramento Police Department arrived in Monterey Park. Although Varela had in-

---

[3]Shortly after Sosa and Varela were booked, Michael Delia arrived at the police station with his attorney, Ralph Bencangey. Sosa talked to Bencangey for about a half hour but Varela refused to see him.

voked his right to consult counsel and had not yet obtained counsel, Steed again read Varela the statement of constitutional rights and requested a waiver. When Steed said that Varela was not a suspect in the Ellen Delia killing, Varela agreed to waive his *Miranda* rights. Varela related his activities on the day of the Ellen Delia killing, but refused to answer further questions.

Steed then summoned Officer Morrill to speak to Varela. Morrill told Varela that he was aware of the activities of the Mexican Mafia and of Varela's membership, but Varela refused to answer further questions.

On February 22, Special Agent Minjares returned to talk to Varela. He asked Varela who sponsored his membership in the Mexican Mafia and whether Varela was afraid; Varela denied knowledge of the prison gang.

On February 23, the district attorney declined to prosecute Varela on any charges arising from the February 20 detention or the subsequent impound search of the car on the ground that the detention, arrest, and search were probably illegal. Minjares then arranged for a parole hold to prevent Varela from being discharged, and Varela was transferred from Monterey Park to the Los Angeles County jail.

On February 25, Officer Steve Simonian, a member of the Prison Gang Task Force and Gilbert Avila, task force coordinator, arranged for a former Mexican Mafia member, Carlos Ortega, to talk to Varela. Ortega spoke to Varela of the advantages of leaving the Mexican Mafia, and he said the gang had a contract on Varela's life. Ortega then introduced Avila, who discussed Varela's situation and parole hold. The police testified that Varela then agreed to cooperate with the investigation, saying that he was tired of Mexican Mafia activities, feared for his own safety and that of the woman he was living with, and realized that because of the parole hold he would not be released unless he agreed to cooperate.

After Varela agreed to assist the investigation, the police returned him to Monterey Park and resumed questioning. Interrogation, primarily by Officers Helvin and Ostrum of the Los Angeles Police Department, continued for most of the day of February 27, and four to six hours on February 28. During this interrogation, Varela said that Gon-

zales had weapons in his El Monte residence which might have been used in the murders under investigation.

On March 1, Helvin and Varela drove around Los Angeles County and located several residences, including that of Gonzales. Helvin prepared statements for Varela's signature and obtained a search warrant for Gonzales' house.

Helvin and six other policemen went to the Gonzales residence at 7:05 a.m. on March 3 to serve the warrant. After announcing his presence and receiving no response, Helvin kicked down the front door. As he entered he saw Gonzales going toward the bathroom carrying balloons. Assuming the balloons contained heroin, Helvin arrested and handcuffed Gonzales. Before leaving the Gonzales residence, Helvin left his business card with Mrs. Gonzales.

Following the arrest, Investigator Alan Price, a Monterey Park police officer, drove Gonzales to the Los Angeles City jail. During that ride, Price asked Gonzales "is it going to be, Eddie, every three months the police come, serve a search warrant at your house, kick down your door, terrorize your children, scare the heck out of your wife and take you away in shackles . . . ." Gonzales replied with the incriminating comment, "I'll have to do the time." At this point he had not been advised of his *Miranda* rights, and in fact was not advised of those rights until about 30 hours after the arrest.

During the booking process, Helvin also attempted to elicit statements from Gonzales without advising him of his constitutional rights.

Officer Price testified that during the police search of the Gonzales residence and arrest of Gonzales, Mrs. Gonzales appeared "terrified" and their children were "scared, screaming, crying." His statement to Gonzales while driving to the station, in which he spoke of police action that would "terrorize your children, scare the heck out of your wife . . ." lends support to this description. As soon as booking was completed, Gonzales phoned his wife; the following day she phoned Helvin and said Gonzales wanted to speak to him. Helvin immediately went to Gonzales and read him a statement of constitutional rights; Gonzales agreed to waive his rights and to talk to Helvin of the Ellen Delia killing.

Gonzales testified before the Sacramento County Grand Jury, which returned an indictment asserting that Gonzales and defendants conspired to murder Ellen Delia and that Gonzales and Sosa carried out that plan. Defendants were arrested, and moved to suppress the statements and anticipated testimony of Gonzales, Lara, and Maddox. After hearings which extended over a year and a half, the trial court granted the motion.

The trial court concluded, first, that the detention and arrest of Sosa and Varela were illegal, a subterfuge to permit the police to question persons going to the Delia residence. It stated that "[i]t cannot seriously be contended that there was any element of good faith in the stop. It was made without probable cause for investigatory purposes only."

Next, the court reasoned that Varela's statements to the police were the unlawful product of the illegal detention and arrest. To escape the original taint, the court explained, the statements must be shown to be voluntary. Varela's statements could not be considered voluntary, both because they were the product of intense police interrogation and because they were obtained in violation of his *Miranda* rights.[4]

Since the Varela statements formed the basis for the warrant to search the Gonzales residence, the trial court concluded that the warrant, and consequently the search, was illegal. The People, however, maintained that Gonzales' statements to the police were voluntary, and free from the taint of the illegal entry and search. They relied on the testimony of Helvin that Gonzales agreed to become a witness for the state "because his family was tired of his activities; his family was tired of the time he had spent in prisons, his wife, particularly; he was concerned because his children were reaching the age where they were now beginning to understand what some of his activities were all about and the fact that he had been away, and where he was; he was tired of having the organization, the group come to him every time they needed something done."

---

[4]Varela was questioned by a number of officers after he invoked his right to remain silent until he could consult counsel. In *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], we stated that "[a]fter the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary." (P. 240, quoting *People* v. *Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114].)

It is apparent, however, that the trial court did not credit his testimony. The court pointedly noted that, with the exception of the Sacramento law enforcement officers, "the testimony elicited during these proceedings shows a remarkable lack of recall by the witnesses, or more specifically the selected lapse of memory in certain key areas." It also specifically found that Varela's statement was the result of intense pressure by police interrogators following the initial illegal arrest, a finding which implies that the officers did not testify candidly concerning Varela. As noted by Justice Blease in the Court of Appeal opinion below, "Since the trial court disbelieved the Varela reasons and Helvin, who was present when Varela turned, offered substantially the same reasons for Gonzales' turning, the trial court must be read as disbelieving Helvin's testimony."

■ Apart from doubts respecting Helvin's testimony, the record contains other substantial evidence supporting the trial court's determination that Gonzales' actions were not voluntary. We have recounted earlier the circumstances of the police entry into his residence and Officer Price's threat that unless Gonzales changed his conduct the police would return every three months, "serve a search warrant at your house, kick down your door, terrorize your children, scare the heck out of your wife and take you away in shackles." We noted also Gonzales' confinement and interrogation for more than a day without being advised of his constitutional rights. The trial court reasonably inferred that Gonzales' decision to cooperate followed so closely upon these events as to be the product of such police misconduct, not a voluntary act.[5]

### 2. *United States v. Ceccolini does not require the admission of Gonzales' statements or anticipated testimony.*

Despite the trial court's findings, the People argue that the decision of the United States Supreme Court in *United States* v. *Ceccolini* (1978) 435 U.S. 268 [55 L.Ed.2d 268, 98 S.Ct. 1054] requires admission of Gonzales' statements and testimony. They point in particular to

---

[5]Although the prosecution bears the burden of proof on the issue of attenuation (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 898-899 [135 Cal.Rptr. 786, 558 P.2d 872]; *People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 411 [118 Cal.Rptr. 617, 530 P.2d 585]), it failed to present the one witness—Gonzales himself—who could best testify as to the reasons for Gonzales' decision to turn state's evidence. There is no suggestion in the record that Gonzales was unavailable; he testified earlier before the grand jury and has received a grant of immunity.

the court's declaration that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support the suppression of an inanimate object." (P. 280 [55 L.Ed.2d at p. 279].)

In *Ceccolini* a police officer on a short break went behind a customer counter in defendant's flower shop to talk with the officer's friend, a shop employee. During the conversation the officer noticed an envelope lying behind the counter. Money protruded from the envelope. The officer examined the envelope and found that it also contained betting slips. The officer reported this information to his superiors, who in turn reported it to an FBI agent investigating suspected gambling operations in the flower shop. Four months later the agent interviewed the flower shop employee, who agreed to testify against defendant.

The trial court suppressed the employee's testimony because she came to the government's attention as the result of an illegal search. The Supreme Court reversed, holding that the connection between the lawless police conduct and the challenged testimony was sufficiently attenuated to dissipate the taint of the illegal search.

Rejecting the government's argument that witness testimony should be admitted regardless of the proximity between the testimony and the illegality, the court announced an attenuation analysis designed to determine whether the purposes behind the exclusionary rule are served by suppression of the witness' testimony. In performing this analysis, the court emphasized as one consideration the degree of free will exercised by the witness because "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." (P. 276 [55 L.Ed.2d at p. 277].) The court also required a close, direct link between the illegality and the evidence before suppressing testimony because suppression disables the witness from testifying about material facts and because the cost of such suppression is high in terms of distorting the outcome of the trial.

Applying this analysis, the court found that the evidence overwhelmingly indicated that the witness' testimony in *Ceccolini* was a product of the witness' free will rather than a result of the illegal search of the flower shop. The court also noted the substantial four-month interlude

between the illegal conduct and the FBI's interview of the witness, and observed that the officer's search was not made *with the intent* of finding either evidence of or testimony about illegal gambling. The court thus reversed the suppression order because "[a]pplication of the exclusionary rule ... could not have the slightest deterrent effect ..." and "[t]he cost of ... silencing [the employee] is too great ...." (*Id.*, at p. 280 [55 L.Ed.2d at p. 279].)

Nothing in *Ceccolini* mandates reversal of the trial court's ruling in this case. *Ceccolini* does not diminish the government's burden of proving attenuation, a burden which, under the present circumstances, required the People to prove the voluntariness of Gonzales' statements. As we explained previously, the prosecution failed to surmount that burden. While in *Ceccolini* the evidence "overwhelmingly" indicated that the witness volunteered the challenged testimony, here the record leads to the opposite conclusion. Gonzales was a suspect[6] whose home had been illegally entered with the intention of finding evidence against him. He had been arrested, charged with a crime, held in police custody and repeatedly interrogated. There was evidence that he was implicitly threatened with more of the same. The factual setting of the present case thus supports the implicit finding of the trial court that the cooperation of Gonzales was involuntary, a finding which distinguishes *Ceccolini* from the case at bar.

The conduct of the police investigation in the present case further distinguishes *Ceccolini*. As Justice Janes observed in his concurring opinion in the Court of Appeal, "[c]ompared with the egregious conduct here of Sergeant Helvin, the lead and arresting officer, *Ceccolini* is a tame case .... There is no such extensive and oppressive police misconduct as that which stigmatized the actions of the officers in the present case."

3. ■ *The People's right to reopen a suppression ruling is governed by section 1538.5, subdivision (j).*

The People finally argue that the trial court erred in suppressing Gonzales' anticipated trial testimony, since the implied finding Gon-

---

[6]The Ninth Circuit Court of Appeals recently noted that *Ceccolini* distinguished between the live testimony of a potential codefendant and that of a witness not arrested nor implicated in the criminal activities at issue. (*United States* v. *Humphries* (9th Cir. 1979) 600 F.2d 1238, 1247.)

zales will not ultimately testify on his own free will "is necessarily an exercise in sheer guesswork." They speculate that intervening events "may well transform Gonzales into a most willing and enthusiastic ally of the prosecution," and further suggest that "[t]here [is] no reason why the claim cannot be litigated pretrial, as in the present case, reserving only for trial resolution where appropriate the question of the witness' willingness and motivations in testifying as a foundational inquiry and condition precedent to proffering the witness' testimony (Evid. Code, §§ 402, 403, 405)."

The People do not make any showing that there are or will be such "intervening events" and did not avail themselves of the extraordinarily lengthy section 1538.5 proceedings to show that some act of free will occurred subsequent to the events reviewed here. Thus their argument reduces to the claim that the section 1538.5 procedure is inadequate to the task of adjudicating an issue of attenuation involving trial testimony and that the trial court cannot rule on the issue before the moment arrives for the introduction of the testimony.

We disagree with the People's contention. Section 1538.5 provides the method under California practice for determining whether evidence, including testimonial evidence, should be suppressed as the product of an illegal search or seizure. The issue of attenuation is frequently litigated and resolved in such proceedings. (See, e.g., *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683].) As Justice Blease observed below, "[t]here is no substantive or procedural warrant for the piecing off of the attenuation issue from the Fourth Amendment claims. The issue of attenuation is but one side of the coin of derivative illegality."

Even when the issue of attenuation depends in part on the state of mind of the witness, as in the present case, the section 1538.5 procedure ordinarily operates sufficiently close to trial to provide the People with an adequate opportunity to show that the witness' anticipated testimony is independent of any prior unlawful police activity. The witness's motive and state of mind at the time of that hearing would in most cases reasonably forecast his motive and state of mind at the time of trial a short while thereafter.

The People in this case had ample opportunity to litigate the issue of attenuation in the year and one-half during which the trial court conducted the section 1538.5 proceedings. They elected to rely upon events

immediately following the illegal search and seizure to prove attenuation, but they failed in their burden of proof. Under these circumstances, the People's right to reopen the suppression issue is limited by the terms of Penal Code section 1538.5, subdivision (j). That subdivision provides that "[i]f defendant's motion is granted at a special hearing in the superior court, the people, if they have additional evidence relating to the motion and not presented at the special hearing, shall have the right to show good cause at the trial why such evidence was not presented at the special hearing and why the prior ruling at the special hearing should not be binding, or the people may seek appellate review as provided in subdivision (o) .... If the people prosecute review by appeal or writ to decision, or any review thereof, in a felony or misdemeanor case, it shall be binding upon them."[7] The People may reopen a suppression ruling only pursuant to the restrictive terms of this provision. They make no claim to have complied with this provision in the present case.[8]

Accordingly, we deny the peremptory writ of mandate, and discharge the alternative writ previously issued by the Court of Appeal.

Bird, C. J., Mosk, J., Richardson, J., Newman, J., and Kaus, J., concurred.

Petitioner's application for a rehearing was denied August 18, 1982, and the opinion was modified to read as printed above.

---

[7]The testimony of a witness is not a product of his own will, free from the taint of a prior illegal search, if that testimony was "coerced or even induced by official authority." (*United States* v. *Ceccolini, supra*, 435 U.S. at p. 279 [55 L.Ed.2d at p. 279].) Thus the prosecution cannot reopen an adverse ruling simply by offering the witness greater inducement to testify and proving his willing acceptance of the benefits offered.

[8]No cases have decided whether the People can still seek to reopen a suppression ruling on a showing of good cause after an appellate court has upheld the ruling at the section 1538.5 hearing. That issue has not been argued in the present case, and we do not decide it here.