**STATE of Utah, Plaintiff and Appellee,**

v.

**Dale Ryan McGRATH, Defendant and Appellant.**

**No. 950230–CA.**

Court of Appeals of Utah.

Nov. 29, 1996.

Robert K. Heineman and Lisa J. Remal, Salt Lake City, for Defendant and Appellant.

Jan Graham and J. Frederic Voros, Jr., Salt Lake City, for Plaintiff and Appellee.

Before DAVIS, BENCH and WILKINS, JJ.

BENCH, Judge:

Defendant Dale McGrath appeals his conviction of two counts of robbery, a second-degree felony, in violation of Utah Code Ann. § 76–6–301 (1995). Defendant challenges the trial court's denial of his motion to suppress. We affirm.

## BACKGROUND

Early in the morning of March 22, 1993, an armed robber held up two convenience stores. Upon receiving notice of the robberies, Officer Jack Dwyer proceeded to the site of the second robbery, which had occurred at around 3:15 a.m. The store clerk told Officer Dwyer that a single gunman had demanded money, ordered the clerk to the ground, and fled. The clerk said that within a minute or so after the robbery, he got up off the floor and saw an older white full-size pickup truck heading north past the store "at a high rate of speed." The clerk could not describe other details of the truck or its number of occupants.

Officer Dwyer left the store to patrol the area for suspects. He testified that traffic in the area was "extremely light for that time of the morning." An hour and one-half after the second robbery, in a location approximately four miles from the store, Officer Dwyer observed an older white pickup truck passing through an intersection at about 40

to 50 miles per hour. The speed limit on the street was 40 miles per hour. Because the vehicle matched the clerk's description of the truck seen at the second robbery, Officer Dwyer pursued it. He then turned on his siren and lights, although he had not followed the truck long enough to feel "comfortable" issuing a speeding ticket. At "about the same time" he turned on the lights, he noticed the truck's tailpipe dragging on the ground. Officer Dwyer testified, however, that he was interested in stopping the truck primarily because it matched the clerk's description of the vehicle passing the store soon after the robbery.

Officer Dwyer stopped the truck and ran warrant checks on the two occupants, defendant and David Ricks. Finding "numerous warrants on both parties," Officer Dwyer and another police officer, who had just arrived on the scene, arrested defendant and Ricks. Some time after arriving in jail, Ricks, who had arrest warrants on four unrelated second-degree felony charges, confessed to committing the two robberies with defendant. Ricks later pleaded guilty to one count of aggravated robbery and the State dismissed the other charges.

Defendant was charged with two counts of aggravated robbery. Defendant filed a motion to suppress the evidence obtained from the stop. In granting the motion to suppress, the trial court concluded that because "there are a lot of older white pickup trucks floating around" and the clerk could not link the gunman to the truck, Officer Dwyer did not have an articulable suspicion to stop the truck. The trial court stated, "I think it was good police work and I hate like anything to pull the rug out from under it. But I just think I have to." Thus, the court suppressed the evidence obtained from the stop, including Ricks's confession implicating defendant in the robberies. The State elected not to appeal the order of suppression and dismissed its case against defendant.

In September 1993, the State sought to connect defendant to the robberies without relying on the illegal stop. At Detective James Glover's request, Ricks's attorney arranged a meeting in jail between Ricks and Detective Glover. Although Ricks was ini-

tially reluctant to speak with Detective Glover, Ricks's attorney confirmed that it was "all right" to speak to the officer. Ricks then described the details of the robberies. Ricks later testified that he cooperated with Detective Glover to receive a favorable sentence. Ricks agreed to testify against defendant and, at defendant's preliminary hearing, did testify concerning the details of the robberies.

On the same day that Detective Glover visited Ricks in jail, Officer Dwyer gave Detective Glover the white pickup truck's license plate number, which Officer Dwyer had noted before stopping the truck. Detective Glover found that the truck was registered to defendant. On the following day, Detective Glover spoke with defendant's mother, Marjorie McGrath, at the address listed on defendant's registration. Mrs. McGrath recalled that on the evening before the robberies, defendant and Ricks had left her home in the white pickup truck. She remembered defendant later told her that he was driving Ricks around to find a place for him to stay, and that Ricks had given him $10.00 for gas. Detective Glover asked Mrs. McGrath to have defendant contact him.

Later that same day, defendant called Detective Glover, who told defendant that the State was going to refile the case. Defendant was reluctant to talk to Detective Glover, but did say that Ricks had given him $10.00 between the robberies. Defendant never indicated, however, that he knew the $10.00 was the proceeds of a robbery. On September 24, 1993, the State refiled its case against defendant.

Defendant again filed a motion to suppress. This time, the trial court denied defendant's motion, concluding that the testimony of Ricks and the statements of Mrs. McGrath and defendant to Detective Glover were sufficiently attenuated from the illegal stop. Defendant then pleaded guilty to two counts of robbery, a second-degree felony, preserving his right to appeal the denial of his motion to suppress and to withdraw the plea if successful on appeal. *See* Utah R.Crim.P. 11(i); *State v. Sery*, 758 P.2d 935, 939 (Utah App.1988).

On appeal, defendant claims the statements that he and Mrs. McGrath gave to Detective Glover and the testimony of Ricks are inadmissible "fruit" of the illegal stop. The State contends the evidence is sufficiently attenuated from the illegal stop. Alternatively, the State argues that the evidence would have been inevitably discovered without the illegal stop. Defendant urges that, in any event, Ricks's testimony should be excluded under Article I, section 14 of the Utah Constitution.

### STANDARD OF REVIEW

■ We review the trial court's factual findings underlying its decision to deny defendant's motion to suppress under a clearly erroneous standard. *State v. Brown,* 853 P.2d 851, 854 (Utah 1992). We review the trial court's conclusions of law for correctness. *Id.* at 855.

### ANALYSIS

■ While defendant's brief mentions the statements that he and Mrs. McGrath gave to Detective Glover, defendant's analysis does not challenge the trial court's conclusion that these statements are sufficiently attenuated from the illegal stop. Rather, defendant applies the attenuation analysis only to Ricks's testimony. Therefore, we do not disturb the trial court's conclusion that the statements of Mrs. McGrath and defendant are sufficiently attenuated. We address only the admissibility of Ricks's testimony. *See State v. Yates,* 834 P.2d 599, 602 (Utah App. 1992) (refusing to "consider arguments which are not adequately briefed on appeal").

■ To deter violations of Fourth Amendment rights, the United States Supreme Court has declared that illegally-acquired evidence is inadmissible. *Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914). The Supreme Court has further recognized, however, that the connection between the illegal conduct and the evidence "may have become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Evidence is not " 'fruit of the poisonous tree' simply be-

cause it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *see also United States v. Hooton,* 662 F.2d 628, 632 (9th Cir.1981) (stating that evidence may be attenuated even if police misconduct "was one step in a series of events that led to the [discovery of evidence]"), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). Rather, we focus on whether the evidence resulted primarily from the " 'exploitation of [the] illegality' " or " 'by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted).

In *Wong Sun,* the Supreme Court declared that "the policies underlying the exclusionary rule" do not "invite any logical distinction between physical and verbal evidence." *Id.* at 486, 83 S.Ct. at 416. Therefore, "verbal evidence ... is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.* The Supreme Court later recognized, however, that "greater reluctance" should be used in excluding live witness testimony than in suppressing "an inanimate object." *United States v. Ceccolini,* 435 U.S. 268, 280, 98 S.Ct. 1054, 1062, 55 L.Ed.2d 268 (1978).

In *Ceccolini,* a police officer, who was visiting his friend in a flower shop, illegally searched an envelope containing policy slips used for gambling. *Id.* at 270, 98 S.Ct. at 1057. The police had earlier investigated the flower shop as a potential site of gambling operations. *Id.* at 271–72, 98 S.Ct. at 1058. The officer's friend later testified against Ceccolini in a perjury trial resulting from his denial of involvement in gambling activities. *Id.* at 272, 98 S.Ct. at 1058.

■ The *Ceccolini* Court observed that "since the cost of excluding live-witness testimony often will be greater," the law requires for exclusion "a closer, more direct link" between the illegal conduct and the testimony. *Id.* at 278, 98 S.Ct. at 1061. The Supreme Court further cautioned that attenuation "cannot be decided on the basis of causation in the logical sense alone," but involves an evaluation of several factors. *Id.* at 274, 98 S.Ct. at 1059. These factors in-

clude: (1) whether the witness gave testimony freely and voluntarily; (2) whether illegally-seized evidence was used to elicit the testimony; (3) the length of time between the illegal conduct, "initial contact with the witness," and "testimony at trial"; (4) whether the police knew the identity of the witness before the illegal conduct; and (5) whether the purpose of the illegal conduct was to find "a willing and knowledgeable witness to testify against" defendant. *Id.* at 279–80, 98 S.Ct. at 1062; *see also United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1397 (9th Cir.1989) (applying *Ceccolini*'s five factors); 5 Wayne R. LaFave, *Search and Seizure* § 11.4(i), at 329 (3d ed. 1996). We conclude that, when applied to the facts of this case, the *Ceccolini* factors favor the admissibility of Ricks's testimony.

### 1. Free Will of Witness

■ "[T]he degree of free will" exercised by a "putative defendant," such as Ricks, is relevant in deciding whether "the basic purpose of the exclusionary rule will be advanced by its application." *Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060. Witness testimony is admissible where it is "the product of detached reflection and a desire to be cooperative." *Id.* at 277, 98 S.Ct. at 1060; *see also State v. Romero,* 624 P.2d 699, 702 (Utah 1981) (stating that testimony must "spring basically from an independent motivation by the witness to make the disclosure").

■ Defendant argues that, because Ricks was not a "willing citizen witness," the testimony was not freely given. The courts, however, have refused to limit the application of *Ceccolini* to citizen witnesses testifying "out of civic duty." *Hooton,* 662 F.2d at 633; *see also State v. Bravo,* 158 Ariz. 364, 762 P.2d 1318, 1329 (1988), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989).

Defendant also maintains that Ricks's plea bargain and subsequent testimony were not the result of Ricks's free will, but arose from the leverage that the State acquired over Ricks through the illegal stop. In some situations, courts have refused to recognize a plea bargain or similar agreement as an indicator of the witness's "detached reflection."

*See, e.g., United States v. Scios,* 590 F.2d 956, 961 (D.C.Cir.1978) (noting that testimony was given "solely to avoid being jailed for contempt"); *United States v. Karathanos,* 531 F.2d 26, 35 (2d Cir.) (concluding that government had "considerable leverage" over illegal aliens who testified to avoid prosecution and deportation), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). In other situations, however, courts have concluded that a witness's decision to testify as part of a plea agreement may reflect an independent act sufficient to purge any taint of prior illegality. *See, e.g., United States v. Schaefer,* 691 F.2d 639, 645 (3d Cir.1982) (holding that witness's decision to testify "stemmed from his voluntary decision to promote his own interests with respect to sentencing"); *United States v. Brookins,* 614 F.2d 1037, 1043 (5th Cir.1980) (stating that witness's testimony was not coerced although "partially induced by a grant of immunity"); *United States v. Hoffman,* 385 F.2d 501, 504 (7th Cir.1967) (holding that "source" of co-conspirator's testimony was not exploitation of illegal arrest, but the "decision to plead guilty" and "subsequent determination to testify as a government witness"), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968); *State v. Kent,* 391 So.2d 429, 432 (La.1981) (concluding that "testimony could only be obtained as a result of a plea bargain," which "constituted the direct motivation" to testify).

The facts and circumstances of the instant case show that Ricks's decision to testify was a product of his own free will. Although Ricks entered a guilty plea only a month after his arrest, the record reveals that he did not decide until some time in September to testify against defendant. Thus, he had several months to consider his options. Moreover, although Ricks was initially hesitant to speak with Detective Glover, Ricks's attorney, who had arranged the meeting, confirmed that it would be "all right" to do so. *See People v. Bell,* 105 Ill.App.3d 208, 61 Ill.Dec. 98, 100, 434 N.E.2d 35, 37 (1982) (emphasizing that witness gave statement on advice of attorney), *cert. denied,* 459 U.S. 1213, 103 S.Ct. 1210, 75 L.Ed.2d 449 (1983). Thus, Ricks's motivation in cooperating with

the police was to "promote his own interests with respect to sentencing." *Schaefer*, 691 F.2d at 645.

■ Even if Ricks had agreed to testify as part of his plea agreement, the agreement could still have reflected independent motivation underlying Ricks's decision to testify. Ricks's plea agreement arose, in part, from four unrelated second-degree felony charges. The plea agreement did not allow Ricks to avoid punishment—it contemplated a possible prison sentence of five years to life. Upon taking his plea, Ricks signed a statement indicating that he knew any government concessions would not be binding on the judge. Thus, despite a potentially harsh sentence for himself, Ricks still agreed to testify against defendant. *Cf. Scios*, 590 F.2d at 959, 961 (witness granted immunity and testified to avoid contempt charges); *Karathanos*, 531 F.2d at 35 (government promised to not prosecute illegal aliens in exchange for testimony).

### 2. Use of Illegal Evidence

■ Defendant argues that the "information" obtained in the illegal stop was used to elicit Ricks's testimony. The State responds that this factor refers only to the use of "physical" evidence derived from the police misconduct. In *Ceccolini*, the Supreme Court noted that the policy slips, which the officer had noticed during the illegal search of the envelope, were not used in questioning the witness. 435 U.S. at 279, 98 S.Ct. at 1062. Subsequent decisions have likewise considered whether the police used illegally-seized physical evidence in securing testimony. *See Ramirez–Sandoval*, 872 F.2d at 1397 (noting that "illegally obtained documentary evidence was clearly used" in questioning witness); *Hooton*, 662 F.2d at 632 (emphasizing that illegally-seized documents "played no part in securing the witnesses' cooperation"); *United States v. Wyler*, 502 F.Supp. 969, 972 (S.D.N.Y.1980) (stating that photographs and notes gleaned from documents obtained through illegal search "were not used to induce" witness's statement).

Ricks's initial confession following his arrest was suppressed in the prior case. Therefore, we do not consider whether illegal physical evidence was used to elicit his confession. Rather, we focus on Ricks's discussion with Detective Glover in jail and the testimony given at defendant's preliminary hearing. The record does not reveal the use of any illegal physical evidence in either of those events.

### 3. Passage of Time

■ The *Ceccolini* Court noted that "[s]ubstantial periods of time" had elapsed between the illegal search, "initial contact with the witness," and "testimony at trial." 435 U.S. at 279, 98 S.Ct. at 1062. The eight-month period elapsing before Ricks testified was significant and favors attenuation in the instant case. *See State v. Childress*, 35 Wash.App. 314, 666 P.2d 941, 943 (1983) (holding testimony attenuated where the police department's "independent investigation . . . served to lengthen the 'road' between the initial search and the testimony at trial"). Defendant argues that the "coercive atmosphere" of Ricks's detention renders insignificant the time lapse in this case. Beyond incarceration, however, the record reveals no use of coercion or threats against Ricks. *Cf. People v. Superior Court*, 31 Cal.3d 883, 185 Cal.Rptr. 113, 649 P.2d 696, 701–02 (1982) (noting that illegally-arrested suspect was "repeatedly interrogated" in custody and "threatened with more of the same").

### 4. Knowledge of Witness's Identity

■ In *Ceccolini*, the Supreme Court emphasized that the identity of the witness was "well known" to the police before the illegal search of the envelope. 435 U.S. at 279, 98 S.Ct. at 1062; *see also Schaefer*, 691 F.2d at 645 (noting police did not learn witnesses' identities from illegal search and "would have questioned" them regardless of search). In the instant case, neither Officer Dwyer nor any other police officer knew Ricks's identity before the illegal stop. Officer Dwyer, however, had noted the license plate number of the white pickup truck before the stop. Without relying on the illegal stop, Detective Glover later used the license plate number to discover defendant's identity and address. When Detective Glover visited defendant's residence, Mrs. McGrath told

Detective Glover that Ricks was with defendant on the evening before the robberies. Therefore, the police would have discovered Ricks's identity without the illegal stop. *Cf. Ramirez–Sandoval*, 872 F.2d at 1397 (noting that authorities "would have never discovered" identity of witnesses except for illegal search); *Bravo*, 762 P.2d at 1329 (concluding that "the state never would have found" the witness without illegal police questioning).

### 5. Purpose of Police Misconduct

 The *Ceccolini* Court determined that the officer did not intend to find tangible evidence or a "knowledgeable witness to testify against" the defendant. 435 U.S. at 279–80, 98 S.Ct. at 1062. The Supreme Court stated that the analysis might have been different had the police intended to discover "potential witnesses." *Id.* at 276 n. 4, 98 S.Ct. at 1060 n. 4; *see also Bravo*, 762 P.2d at 1328 (concluding that police "were attempting to find witnesses when they violated the defendant's *Miranda* rights"). In the instant case, Officer Dwyer was not looking for potential witnesses to tie defendant to the robberies. At the time of the stop, he had no suspect identified. He only knew that a vehicle like the one he had stopped was seen near the site of the second robbery.

Furthermore, in considering the "purpose" of the illegal action, attenuation analysis generally involves inquiry into the "flagrancy" of the police misconduct.[1] *See Brown v. Illinois*, 422 U.S. 590, 604–05, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975) (concluding that illegality of arrest resulting in confession was "obvious" and arrest was "calculated to cause surprise, fright, and confusion"); *State v. Thurman*, 846 P.2d 1256, 1273–74 (Utah 1993) (stating that, although illegal entry leading to consent was purposeful, police were concerned for their safety and relied on valid warrant); *State v. Allen*, 839 P.2d 291, 301 (Utah 1992) (holding that illegal arrest leading to confession was not

flagrant). In our assessment of the flagrancy of Officer Dwyer's illegal stop of defendant's truck, we note the trial court's statement that Officer Dwyer's actions were "good police work." The illegality of the stop was certainly not "obvious," nor was it "calculated to cause surprise, fright, and confusion." *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. Therefore, the police misconduct in this case was not "purposeful."

## CONCLUSION

Although the illegal stop was "one step in a series of events that led to" Ricks's testimony, *Hooton*, 662 F.2d at 632, his decision to testify was sufficiently attenuated from the police misconduct. The *Ceccolini* factors show that the "closer, more direct link" between the illegal conduct and Ricks's testimony is not present in this case. 435 U.S. at 278, 98 S.Ct. at 1061. Under federal constitutional analysis, Ricks's testimony was therefore sufficiently attenuated from the illegal stop.[2] In so holding, we need not reach the State's alternative arguments regarding inevitable discovery.

The trial court properly determined that Ricks's testimony was sufficiently attenuated from the police misconduct in this case. Therefore, we affirm the trial court's denial of defendant's motion to suppress.

WILKINS, J., concurs.

DAVIS, Associate P.J., concurs in result.

---

1. We are bound by the trial court's unappealed ruling that the stop was illegal.

2. Defendant argues that this court should adopt a more stringent test for attenuation under Article I, section 14 of the Utah Constitution. Defendant's nominal references to the Utah Constitution below lacked the groundwork for "thoughtful and probing analysis" of this issue in the trial court. *State v. Bobo*, 803 P.2d 1268, 1272 & n. 5 (Utah App.1990). Therefore, we decline to address defendant's state constitutional argument. *Id.*