[Civ. No. 7297. Fifth Dist. June 20, 1983.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
ALFRED SOSA et al., Real Parties in Interest.

582

584

COUNSEL

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian and Daniel J. Kremer, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Gary A. Binkerd, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Hinkly & Suhr, Paul R. Hinkly, Ernest S. Kinney, Putnam & Morris, Ralph L. Putnam, Carolyn M. Morse and Hugh Wesley Goodwin for Real Parties in Interest.

Quin Denvir, State Public Defender, and Charles M. Sevilla, Chief Deputy State Public Defender, as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**ANDREEN, J.**—Original proceeding brought by the People to review a trial court order suppressing the statements and anticipated testimony of Juan Hernandez (Pen. Code, § 1538.5, subd. (o)), and the statements and anticipated testimony of Ramon Mendoza.[1] Because the factual and legal issues are diverse, our discussion treats the issues concerning the two witnesses separately.

### I. JUAN HERNANDEZ

### A. FACTS

The three defendants (real parties in interest herein) are charged with the murder of Gilbert Roybal. Many of the operative facts, however, arise out of the murder of Ellen Delia on February 17, 1977. Her widower, Michael, was a suspect in his wife's and another's murder. His house was placed under surveillance. Defendant Sosa and another, Armando Varela, were illegally arrested when they drove to and parked in the driveway of the Delia residence. Thence commenced a series of illegal police conduct chronicled in *People* v. *Superior Court (Sosa)* (1982) 31 Cal.3d 883 [185

---

[1]The parties stipulated below that the court could hear and determine the issue of whether Mendoza could testify by an *in limine* motion and that the ruling would be binding on the trial court. The issue involves a Sixth Amendment right. Our issuance of the order to show cause was a determination that no remedy other than by writ would be adequate. (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 118 [145 Cal.Rptr. 674, 577 P.2d 1014]; *Corona etc. Hosp. Dist.* v. *Superior Court* (1964) 61 Cal.2d 846, 851 [40 Cal.Rptr. 745, 395 P.2d 817].)

Cal.Rptr. 113, 649 P.2d 696] (*Sosa/Delia*).[2] This law enforcement action was better suited to a police state than a constitutional democracy and resulted in the affirmance of a trial court order suppressing evidence in *Sosa/Delia*. The decision rested upon an illegal arrest of Sosa and Varela, illegal questioning of Varela who implicated Gonzales, illegal search of Gonzales' home, and an illegal interrogation of Gonzales eliciting an implication of Juan Hernandez. Hernandez was arrested in April 1977 and detained for two years, until June 1979, in the Sacramento County jail. His arrest and detention was illegal since it was based on the police conduct described in *Sosa/Delia* and summarized in footnote 2, *ante*.

The incarceration of Hernandez in Sacramento was marked by several events. He began a relationship with a new girl friend, Mickie Ramirez, concerning whom he had sexual fantasies. In May 1979, following a successful suppression hearing at the trial court level, the Sacramento County District Attorney announced that Hernandez would be released from jail. This was followed two days later by a statement that the matter would, instead, be appealed, and it would take six months or longer in the appellate courts. Meanwhile threats were made against Mickie's life by Mexican Mafia members. These experiences had followed a five-year prison term from which Hernandez was released in January 1977, some few months before he was arrested on the Delia murder case.

As a result of these pressures, Hernandez decided to turn state's evidence. Thereafter, the district attorney twice arranged for Hernandez and Mickie to have sexual relations. Hernandez was transferred to Tehachapi and Mickie was moved to Bakersfield where her rent and utilities were paid for by the Sacramento County District Attorney's office. His special status continued there.

During the pendency of the Delia case in Sacramento, Fresno County authorities were investigating the unrelated murder of Gilbert Roybal. In

---

[2]Our review is of trial court action taken before the Supreme Court opinion was filed and is based upon evidence presented to it. However, there are no important discrepancies between the statement of facts contained in *Sosa/Delia* and those presented to the trial court in this action. It is thus unnecessary to detail it here. It suffices to set it out in outline form:

Ellen Delia killed February 17, 1977.

Varela and Sosa illegally detained and illegally arrested when they went to visit Delia residence on February 20.

Varela illegally questioned for five days (threats of harassment; violations of *Miranda*).

Varela implicated Gonzales. On basis of Varela statement search warrant issued on Gonzales' home—search warrant illegal-search illegal.

Gonzales questioned in violation of *Miranda*. There were threats of harassment against him and his family.

Gonzales implicated Hernandez, who was arrested in April 1977.

Hernandez turned state's evidence on Delia case in June 1979, moved to Tehachapi in June 1979, deported to Mexico October 1980.

July 1980, Darral Kennedy, a Fresno County District Attorney investigator, spoke by telephone with Hernandez at Tehachapi. The conversation was brief and concerned whether the Sacramento County District Attorney would give permission for Hernandez to discuss the Roybal case with Fresno authorities. (Hernandez would not testify without such permission.)

On August 11, 1980, Kennedy again contacted Hernandez but there was no discussion of the Roybal case or any other case.

On October 15, 1980, Kennedy contacted Hernandez a third time. This discussion concerned Hernandez' impending deportation to Mexico upon his release from Tehachapi. Kennedy asked Hernandez to contact him when Hernandez arrived in Mexico if he still wanted to volunteer information. That month Hernandez was released from Tehachapi and deported to Mexico. He was not under parole status or in any other way connected to any official agencies of the United States government or those of any state.

By postcard dated November 5, 1980, Hernandez contacted Kennedy and informed him of his address in Mexico and a telephone number where he could be reached. About December 10, 1980, Hernandez called Kennedy from Mexico and volunteered the information that subsequently he testified to in the preliminary hearing of defendants Sosa, Torres, and Salas, held in Fresno on July 8, 9 and 10, 1981. This information implicated the three defendants in the planning and execution of the killing of Gilbert Roybal.[3]

At the preliminary hearing Hernandez stated he returned voluntarily from Mexico to testify and that he had been promised nothing in return for his testimony. The court ruled, however, that Hernandez' testimony was the result of the chain of illegal seizures and inadmissible statements that had begun with the arrests in southern California of Sosa and Varela, and that but for this illegality, Hernandez would not have remained in custody during the pendency of the Delia trial. The court felt it was this illegally initiated lengthy period of incarceration that led to Hernandez' decision to turn and to testify and, therefore, the court granted the motion to suppress Hernandez' testimony.

### B. WAS THERE SUFFICIENT ATTENUATION BETWEEN THE ILLEGAL POLICE CONDUCT AND THE TESTIMONY?[4]

There are three recognized methods by which evidence that is the "fruit of the poisonous tree" may be admissible despite its illegal origins:

---

[3]Roybal was a fellow member of the Mexican Mafia who the other members felt should be killed because of his failure to retaliate against another gang and for his neglecting to pay a fellow gang member for some drugs.

[4]Defendants demurred to the petition on the ground that it was deficient. The demurrer is overruled. The petition states sufficient facts and law to warrant consideration on the merits.

(1) if there was an independent source for the evidence, (2) if it would have been available due to inevitable discovery, (3) or if the connection between the source and the evidence has been sufficiently attenuated. (See 3 LaFave, Search and Seizure (1978) § 11.4, pp. 612-680.)

 The only exception urged in the instant appeal is the third—attenuation. It is urged that Hernandez' decision to testify was an independent act of free will manifested when he returned voluntarily from Mexico to testify at the preliminary examination. This also was urged below, but the trial court appears to have focused instead on the first two exceptions. The court remarked:

"I think the true test is whether or not the evidence is obtained as a product of illegal police activity, and I think the burden is on the People, under the law, to establish once the illegality has been shown that this evidence would have, not might have, but would have, been independently available or would have been inevitably obtained by the police, despite the initial illegality. I think it is only speculation for the Court to say that Mr. Hernandez might have been located by the police. I think that he probably would have. But I still think it's *in the area of speculation* whether or not he would have finally turned and become cooperative with the police, despite the illegal arrest and the illegal detention following that arrest.

"Therefore, I think the testimony of Mr. Juan Hernandez must be suppressed in its entirety. And that is the order." (Italics added.)

We believe the true test is to determine whether the preliminary hearing testimony was an exploitation of police illegality, or the result of an intervening act sufficiently strong to break the causal chain. In making this determination, we balance the public need to keep law enforcement officers who are searching for evidence of wrongdoing within the limits of the law against the public interest in having all relevant evidence admitted in prosecutions of crime.

 Although the primary purpose of the exclusionary rule is to deter future unlawful police conduct[5] (*United States* v. *Janis* (1976) 428 U.S. 433, 446 [49 L.Ed.2d 1046, 1056, 96 S.Ct. 3021]), the United States Supreme Court has rejected a "but for" test, declining to suppress evidence "simply because it would not have come to light but for the illegal actions of the police." (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].)

---

[5]The other purposes are the maintenance of judicial integrity and preserving the public's belief that the government will obey the law. (1 LaFave, *op. cit. supra*, § 1.1, pp. 17-20.)

The competing consideration which justifies a rejection of the simple "but for" test is that relevant evidence is excluded and society's interest in convicting the guilty is impaired. Thus circumstances can arise in which application of the exclusionary rule "imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes." (*Brown* v. *Illinois* (1975) 422 U.S. 590, 609 [45 L.Ed.2d 416, 430, 95 S.Ct. 2254] (conc. opn. of Powell, J.).)

■ Information illegally obtained then, does not necessarily become sacred and inaccessible. The Supreme Court recognized early on that "[a]s a matter of good sense" sometimes the causal connection between the initial police misconduct and the evidence sought to be used becomes "so attenuated as to dissipate the taint." (*Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 312, 60 S.Ct. 266].)

Although the trial court apparently failed to undertake the inquiry mandated, the record before us is of sufficient detail and depth from which a determination may be made. It is thus unnecessary to remand the case for further factual findings. (*Brown* v. *Illinois, supra,* 422 U.S. at p. 604 [45 L.Ed.2d at pp. 427-428].)

This case presents extremes. It would be difficult to envision more lawless police conduct. (We note that although the trial court sat in Fresno, the police misconduct involved no local law enforcement agency.) ■ Generally, the more offensive the police misconduct the greater the need for deterrence and, consequently, the broader the application of the exclusionary rule. (*Brown* v. *Illinois, supra,* 422 U.S. at pp. 603-604, fn. 9 [45 L.Ed.2d at p. 427]; see Comment (1967) 115 U.Pa.L.Rev. 1136, 1148-1151.)

■ Given the inexcusable police conduct in this case and the deterrent purpose of the exclusionary rule, suppression of Hernandez' testimony would be a foregone conclusion except for two factors which make this case distinctive: the independent intervening act of free will on Juan Hernandez' part in his decision to return to this country and testify long after he had been deported, and the fact that the police misconduct arose in connection with another case.

It is noteworthy that the police action under scrutiny was directed toward the *Sosa/Delia* trial. It was not in any way connected with the investigation of the Roybal murder. Hernandez' decision to turn state's evidence was for the *Sosa/Delia* trial and arose out of the conditions of his illegal incarceration in connection with it. His motivation to testify in the Roybal murder trial was separate. Although he could have been, he was not charged with

complicity in that murder. Instead, the Fresno County District Attorney's office did nothing more than communicate with Hernandez and fail to intervene in his deportation. The illegality of the police conduct had run its course when it became evident that there could be no prosecution in the Delia murder case due to police malfeasance. The act of Hernandez in voluntarily returning from Mexico to Fresno to testify was a separate, distinct act. Other than general availability of the witness and a metamorphosis from pariah to penitent, the decision to testify was wholly free from *Sosa/Delia* taint. The point of diminishing returns of the deterrence principle has been reached. Errant police have been appropriately deterred from future illegal action by the rulings in *Sosa/Delia*. It would serve no legitimate interest to extend the exclusionary rule to the instant case.

This finding is mandated by respected authority. Thus, in *Wong Sun* v. *United States, supra,* 371 U.S. 471, Toy's statement made as the officers invaded his apartment was excluded, but Wong Sun's statement was made after he had been released on his own recognizance after a lawful arraignment. He returned to the police station several days later voluntarily to make a statement. As to the latter's statement, the court held that it had " 'become so attenuated as to dissipate the taint.' " (At p. 491 [9 L.Ed.2d at p. 457].)

In his lucid concurring opinion in *Brown* v. *Illinois, supra,* 422 U.S. at page 610 [45 L.Ed.2d at page 431], Justice Powell said: "If an illegal arrest merely provides the occasion of initial contact between the police and the accused, and because of time or other intervening factors the accused's eventual statement is the product of his own reflection and free will, application of the exclusionary rule can serve little purpose . . . ."

And in 3 LaFave, Search and Seizure, *supra,* section 11.4, page 638, the author states: "Given the nonutility of the 'temporal proximity' factor, what is required in determining whether a confession is the fruit of a prior illegal arrest is a balancing of the other two factors enumerated in *Brown.* The 'clearest indication of attenuation' should be required where the 'official conduct was flagrantly abusive of Fourth Amendment rights.' *Certainly 'a release of the defendant from custody' would be a sufficient intervening circumstance in such a case.*" (Fns. omitted, italics added.)

Finally, we are told in *United States* v. *Ceccolini* (1978) 435 U.S. 268, 276-277 [55 L.Ed.2d 268, 277, 98 S.Ct. 1054], that we should consider the degree of free will exercised by the witness and to require a close, direct link between the illegality and the evidence before suppressing testimony.

It follows that the trial court erred in suppressing Hernandez' testimony.

## II. Were Conversations Between Sosa and Mendoza in Derogation of Sosa's Sixth Amendment Rights?

### A. Facts

Ramon Mendoza was a member of the Mexican Mafia since joining the organization in 1970 while he was incarcerated in San Quentin. Prior to March 6, 1977, he was in Kern County jail on homicide charges unrelated to the present case. While there, Mendoza decided to provide law enforcement officials with information because "I decided that I was tired of killing people and tired of all the killings that were taking place within the organization and with my life. . . . I was just I was reflecting on what I had done and where I was headed. And I decided that I didn't want any part of it any more."

Shortly before his release from the Kern County jail on or about March 6, 1977, Mendoza spoke with two officers from the prison gang task force, Avila and Minjares, and expressed his willingness to provide them with information. The officers "appeared skeptical at the time as to why I was turning or why I wanted to turn. And it appeared to me that they were trying to feel me out to see if I was on the level or what. And I in turn was feeling them out because I was still trying to get over the psychological hurdle of turning." Avila gave Mendoza his phone number and told him to call when he got out of jail and they would talk about it.

In fact, the day he was released from jail Avila and Minjares gave Mendoza a ride home from the jail. Mendoza testified he could not recall much of the content of their conversation but he did remember that he did not discuss with them the idea of acting as an undercover agent or operative.

The weekend following his release from jail Mendoza attended a baptism at the home of defendant Torres at Torres' request. This was the first time Torres and Mendoza had seen each other in about a year and a half. It was at this baptism that he first learned the details of the Roybal killing. Torres related that he had driven the getaway car and that Sosa had been one of the gunmen. Mendoza did not inquire about the Roybal murder and did not know Avila was interested in any information about the incident.

A criminal complaint was filed against defendants March 7, 1977. A few days later, after Mendoza had attended the baptism and learned of Torres' involvement in the killing, Mendoza called Avila and a meeting was arranged. When they met, Avila asked Mendoza if he could help them locate certain fugitives, including defendant Sosa. Mendoza agreed and asked if

he would be paid. Avila replied that the best he could do was to pay for information if it turned out to be important enough.

About two weeks after this meeting Sosa called the house where Mendoza was staying and left a telephone number. Mendoza returned the call and spoke with Sosa. Sosa asked Mendoza to come to Tijuana and see him. Mendoza agreed and left for Tijuana that day after informing Avila that he was going to Tijuana to meet with Sosa. Avila did not ask Mendoza to question Sosa about anything in particular but did tell him "to go ahead and go to Tijuana and to speak or meet with [Sosa] and that at some point after when I crossed back over the border that I would be contacted by someone and that not to worry about how that would take effect, but it would happen. And with that understanding I went to Tijuana."

Mendoza subsequently met with Sosa in Tijuana. Sosa told Mendoza that he (Sosa) and another, Danny Montellano, had killed Gilbert Roybal. Sosa's comments about the Roybal killing were spontaneous and voluntary and not the result of any questioning by Mendoza. It appeared to Mendoza that Sosa "was just boasting" about the Roybal killing. Sosa also mentioned that Roybal's girl friend, who was present in the house when Roybal was killed, should be killed because she was a potential witness.

In the early part of April 1977 Avila paid Mendoza $500 "for the apprehension of Alfie Sosa."

That same April or May, Mendoza met with Sosa again in the Los Angeles County jail where Sosa by this time was an inmate. Again, Sosa brought up the subject of the Roybal killing. Sosa and Mendoza were speaking face to face using the intercom telephones in the visitors' room. Mendoza testified that Sosa "appeared depressed and he said that, he asked me if the other members of the [Mexican Mafia] were mad at him because of his confession to the Mexican authorities about this Gilbert Roybal homicide and other homicides." Mendoza assured Sosa no one was mad at him because Sosa had not implicated anyone else.

Sosa also asked about Roybal's girl friend. ". . . I think he said, 'Do you remember Lupe, Gilbert's old lady?' And I said that I did. And he looked at me intently and over the phone he told me, 'Give her my regards.' And at the time he was saying that he was gesturing with his thumb down indicating that she should be killed. He also made a statement about that I should have a bottle of T-Bird with her which was a code for killing her."

In July Mendoza went to San Pedro to visit defendant Salas. Mendoza asked Salas why Roybal had been killed and Salas indicated he himself had

ordered the execution. By this time Mendoza had received money from Avila for the information he was supplying and had had several telephone conversations with Avila.

In August or September of 1977, Mendoza visited Salas in the Los Angeles County jail where Salas was an inmate. By written messages Salas reminded Mendoza that Sosa wanted Roybal's girl friend, Lupe, to be killed.

Finally, in September or October of 1977, Mendoza met again with Torres in an apartment in Los Angeles. Torres again indicated his participation in the Roybal killing, saying that no one could identify him. He further stated that it would be difficult to convict Salas because conspiracy was hard to prove in that Salas had ordered Roybal's execution.

The trial court ruled that none of the statements made to Mendoza by Torres, Sosa, or Salas could be used at their trial because it would violate their Sixth Amendment right to counsel. The court reasoned that based on *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183] and *United States* v. *Sampol* (D.C.Cir. 1980) 636 F.2d 621, Mendoza had been acting as a police agent at the time the defendants made their statements to him, and, since charges had been filed against them at the time, they had a right to counsel before talking to a police agent.

### B. Discussion

A prosecution has reached a critical stage after a complaint has been filed. Thereafter, police-initiated interrogation is barred without presence of counsel since it would interfere with the attorney's representation in contravention of the Sixth Amendment. (*Massiah* v. *United States, supra,* 377 U.S. 201.) The *Massiah* rule is based not on any impropriety on the part of an officer, who may be acting properly, but on the interference with the defense attorney. Thus, the rule differs from the exclusionary rule under the Fourth Amendment which focuses on deterrence of police illegality. It also differs from *Miranda's*[6] Fifth Amendment protection, which seeks to prohibit the prosecutor from establishing his case out of the mouth of the accused.

In *United States* v. *Henry, supra,* 447 U.S. 264, a cellmate of the defendant Henry, one Nichols, informed the FBI he was housed in the same cell

---

[6] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

block as Henry who was a suspected bank robber. Nichols had worked previously for the FBI as a paid informant. The FBI told Nichols "to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery. . . . [Nichols] . . . reported that he and Henry had engaged in conversation and that Henry had told him about the robbery . . . ." (*Id.,* at p. 266 [65 L.Ed.2d at p. 119].) Nichols had been told "'not to initiate any conversations with Henry regarding the bank robbery charges against Henry, but that if Henry initiated the conversations with Nichols . . . Nichols [was] to pay attention to the information furnished by Henry.'" (At p. 268 [65 L.Ed.2d at p. 121].)

In deciding *Henry* the court focused on "whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah.* Three factors are important. First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.

"The Court of Appeals viewed the record as showing that Nichols deliberately used his position to secure incriminating information from Henry . . . , . Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion. The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information. This combination of circumstances is sufficient to support the Court of Appeals' determination." (*Id.,* at pp. 270-271 [65 L.Ed.2d at p. 122], fn. omitted.) The court held that telling Nichols not to affirmatively secure incriminating information did not alter the result because, according to Nichols' own testimony, he "was not a passive listener; rather, he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'" (*Id.,* at p. 271 [65 L.Ed.2d at pp. 122-123].)

The court noted in a footnote that under the facts presented in *Henry* they were not "called upon to pass on the situation where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged." (*Id.,* at p. 271, fn. 9 [65 L.Ed.2d at p. 123].) The court also emphasized "Henry's incarceration at the time he was engaged in conversation by Nichols is also a relevant factor" because of "the powerful psychological inducements to reach for aid when a person is in confinement" and because "the mere fact of custody imposes pressures on the

accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." (At pp. 273-274 [65 L.Ed.2d at p. 124], fns. omitted.)

■ Considering first Torres' statements made to Mendoza at the baptism, there was no Sixth Amendment violation under *Massiah* and its progeny for several reasons. First, Mendoza could not yet be considered as a government agent. He had tentatively offered his services to Avila but no working arrangement had been reached. It was not until after the baptism that the "money for information" dealings were arranged.

Furthermore, and unlike the informant in *Henry,* Mendoza did not arrange the meeting with Torres. It was Torres who telephoned Mendoza and asked him to attend the baptism. Neither did Mendoza deliberately elicit the incriminating statements. Mendoza testified that Torres "volunteered" the information, and, that up until that time Mendoza did not know who had been involved in the Roybal killing. Additionally, Mendoza had not been instructed by Avila or any police agents to garner any information. And, of course, the information was not divulged in a custodial setting. All of these factors point to a conclusion that Torres' incriminating statements were not made in derogation of his Sixth Amendment right to counsel.

■ Sosa's statements made to Mendoza in Tijuana also differ in several particulars from *Henry.* First, unlike Henry, Sosa was not in custody during the Tijuana conversations. This distinction is not present of course for the conversations held at the Los Angeles County jail.

Second, although Mendoza was being paid in the same manner as the informant in *Henry,* viz., on a contingency-fee basis whereby he would be paid only for useful information, Mendoza was not to focus his efforts on getting information about a crime. He was asked to help locate Sosa (at least at the time of the Tijuana conversations) in contrast to the informant in *Henry* who appears to have been focused solely on gathering information about a specific bank robbery. (*Id.,* at p. 266, fn. 1 [65 L.Ed.2d at p. 119].)

The linchpin is whether Mendoza "deliberately elicited" the incriminating statements. The informant in *Henry* was found to have "deliberately elicited" Henry's statements, but that was a case involving jailhouse cellmates when the information was " 'the *product* of [the] conversation' " with Henry. (*Henry, supra,* at p. 271, italics added.) Mendoza's situation, on the other hand, is much closer to the circumstances the court alluded to in footnote 9 but on which it refused to comment: "the situation where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged." (At p. 271, fn. 9 [65 L.Ed.2d at

p. 123].) Not only did Sosa himself arrange the meeting in Tijuana, thus insulating the prosecution from a defense charge that it placed Sosa and Mendoza in close proximity, but Mendoza's testimony falls short of making an "effort to stimulate conversations about the crime charged:"

"Q. [prosecutor] Were any of [Sosa's] comments to you the result of your questioning him specifically about the Roybal incident?

"A. [Mendoza] At that time at that point with regard to the Roybal incident my recollection is that those statements were voluntary. But at some point there were questions interjected with regard to the other cases. The best of my recollection is that after he related the Gilbert Roybal homicide to me I asked him to backtrack and for the purpose of trying to ascertain whether who it was that may be testifying against him because we knew at that time that there was someone on the loose giving up information. I asked him to backtrack and see if who could do him any damage with regard to any other homicide. And I did this for the purpose of not arousing suspicion. I didn't want to ask too many questions because I felt I might arouse suspicion.

"Q. Do you recall if [Sosa] said anything about why he was telling you anything about the Roybal killing at all?

"A. I recall that it appeared to me that he was just boasting at the beginning about the Roybal murder."

The trial court was impressed with the language and reasoning of a case which applied *Henry*, *United States* v. *Sampol, supra*, 636 F.2d 621. *Sampol* involved another jailhouse "informant at large" who was to be rewarded with parole if he came through with quality information on the other inmates. The *Sampol* court characterized this activity as "the government trolled in the jail, using [the informant] as bait, and was ready to net any unwary inmate who rose to the lure." (At p. 638.)

These cases are to be contrasted with *United States* v. *Malik* (7th Cir. 1982) 680 F.2d 1162. There, a jailhouse informant was upset with the FBI because he believed his previous informant work should have kept him out of jail. But since he was in jail anyhow he elicited damaging information from his fellow prisoners, the defendants. The *Malik* court limited *Henry* to its facts: "There was testimony indicating that [the informant] felt double-crossed when he was arrested after having been an effective informant. . . . The finding that [the informant was not acting for the government when the Maliks gave their damaging statements] is amply supported by the record.

"Likewise, we do not find for the Maliks as a matter of law. We refuse to extend the rule of *Massiah* and *Henry* to situations where an individual, acting on his own initiative, deliberately elicits incriminating information. In *Henry,* the Court specifically referred to the Government's role as being an important factor. . . . The Maliks suggest that the Government must go to extraordinary lengths to protect defendants from their own loose talk; they suggest that potential informants be segregated from other inmates. We do not believe that the Sixth Amendment right to counsel requires the Government to take such steps." (At p. 1165.)

One California case has squarely confronted *Henry, People* v. *Poore* (1982) 135 Cal.App.3d 882 [185 Cal.Rptr. 615]. In *Poore* the undercover policeman, Perry, was investigating drug and stolen property activities. The defendant came over to Perry's apartment to inspect some stolen property and mentioned he had been to court a few days earlier on an attempted robbery charge and admitted to Perry that he had committed the offense. The appeal court found no Sixth Amendment problem: "Although both the district attorney and [the police department] knew of defendant's pending robbery charge, Perry did not. *Perry did not arrange the meeting with defendant nor did he initiate the conversation with respect to the robbery.* Moreover, Perry could not be expected to be aware of defendant's assertion of right to counsel by his passing reference to a recent court appearance. In short, it is clear Perry's receipt of incriminating statements about the robbery was entirely fortuitous and that defendant's unsolicited statements were given voluntarily." (At pp. 885-886, italics added.)

Mendoza was not sent to Tijuana to elicit admissions from Sosa. He was not sent to fish the waters for information. His only commission was to locate Sosa. Another distinguishing factor is the fact that Sosa was not incarcerated, and therefore was not under psychological pressure to talk. Sosa initiated the meeting and was in an environment which was selected by him. Under such circumstances, if Sosa chose to brag about his exploits, he did so under circumstances of his own making and should not be heard to complain of a breach of his Sixth Amendment rights.

■ The conversations in the Los Angeles County jail are on another footing. At that time, both the police and Mendoza knew that a meeting with Sosa or Salas would likely elicit incriminating evidence. Sosa and Salas were in jail and under whatever psychological pressure would follow. This testimony was properly excluded.

Also properly excluded were the incriminating conversations Mendoza had with Salas in San Pedro in July and the conversation with Torres in September or October in Los Angeles. Although Mendoza testified he· was

not instructed to get the information in either instance, he did arrange the meeting with Salas in San Pedro and he did bring up the subject of the Roybal killing. More importantly, by the time these two conversations occurred, Mendoza had been receiving money for the information he was passing on to Avila and had been in contact with Avila several times prior to the July meeting in San Pedro.

Although neither the San Pedro conversation with Salas nor the Los Angeles conversation with Torres was held in a custodial setting, and although Mendoza had not been instructed to interrogate either Salas or Torres on either of these occasions, the fact that he had been contacting Avila since March and supplying him with information for which he was being paid gives rise to the conclusion that by July at least he certainly was a government agent trolling for information and using his position as a Mexican Mafia member to secure information without arousing suspicion. Accordingly, since Torres and Salas had by this time been charged, any statements they made to Mendoza were in violation of their Sixth Amendment rights. (*United States* v. *Henry, supra,* 447 U.S. at pp. 270-275 [65 L.Ed.2d at pp. 122-125].)

### III. CONCLUSION

The trial court is directed to vacate its order in which it suppressed the anticipated testimony of Juan Hernandez and the anticipated testimony of Ramon Mendoza relating to the Tijuana conversation and the conversation at the Torres baptism. It shall enter its order denying the motion to suppress such testimony.

Zenovich, Acting P. J., and Woolpert, J., concurred.

A petition for a rehearing was denied July 19, 1983, and the petition of real parties in interest for a hearing by the Supreme Court was denied September 8, 1983.