[5 Crim. No. 5807.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFRED DARNELL FORD et al., Defendants and Appellants.

[5 Crim. No. 5872.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY FORD, Defendant and Appellant.

---

[1]Parts II through IX, and X (E) through XIII, are not published, as they do not meet the
standards for publication contained in rule 976(b), California Rules of Court.

**COUNSEL**

Alfred Darnell Ford, in pro. per., Michael R. Gardina, Frank Offen and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Michael R. Snedeker and Augustus E. Noland, Deputy State Public Defenders, for Defendants and Appellants.

John K. Van de Kamp and George Deukmejian, Attorneys General, Daniel J. Kremer and Robert H. Philibosian, Chief Assistant Attorneys General,

Arnold O. Overoye, Assistant Attorney General, Jana Tuton and Margaret E. Garnand, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ANDREEN, J.**—This is an appeal by three defendants, Alfred Ford, Tony Ford and George Momon following convictions by jury trial. The convictions arose out of three robberies.

## I. FACTS

*Victims Karahadian (counts 1 and 2)*

At about 6:30 in the evening on October 31, 1980, defendant Tony Ford and two crime partners burst into the home of Ed and Mary Karahadian by ringing the doorbell and forcing their way in when the door was opened. Tony's two cohorts wore stocking masks but Tony apparently did not. One of the unidentified men threatened the Karahadians with a handgun. In the 10 minutes they were in the house they took $460 in cash, a diamond ring valued at $20,000, a diamond cross worth $2,500 and a watch worth $1,500. Mr. Karahadian, who is 60, identified Tony Ford in a subsequent lineup.

In connection with the crimes against the Karahadians, defendant Tony Ford was found guilty of count 1, robbery (Pen. Code, § 211),[2] with a finding that he was armed with a firearm, a handgun (§ 12022, subd. (a)). He was also found guilty of count 2, first degree burglary (§ 459), with a finding of being armed (§ 12022, subd. (a)).

*Victims Skopp (counts 5, 6 and 7)*

At 3:15 on the morning of November 25, 1980, Helen and Joseph Skopp, ages 70 and 71 respectively, were awakened in bed by two masked intruders who turned on the lights and demanded to know where the safe, money, and jewelry were. The two men began to beat the elderly couple severely when they denied that they had a safe in the house. The assailants beat them with their fists and with a pistol which the two men kept changing back and forth between them as they beat the couple.

One of the attackers, whom Mrs. Skopp identified as defendant Momon, ripped off her nightgown and said, "I'm going to rape your wife." The

---

[2]All statutory citations are to the Penal Code unless otherwise noted.

other assailant pulled Momon aside, said something to him and Momon then backed away. Mrs. Skopp identified the other assailant as Alfred Ford.

Alfred Ford then took her downstairs while she led him through the house showing him where the silverware, silver, furs, and jewelry were. These items were taken as well as $650 in cash and a wristwatch. Several identifiable items of jewelry and silverware were recovered by the police in the apartment of Alfred and Tony Ford.

A neighbor of the Skopps whose work hours are from 3 a.m. to 11 a.m. saw Alfred Ford's blue Volkswagen parked in front of the Skopp's house when he left for work that morning. The car was unoccupied with the motor running and the lights out.

As a result of his injuries, Mr. Skopp was kept in a coronary care unit at a hospital for 10 days after the assault. At the time of trial he still had to have a cardiogram done every two months.

In connection with the crimes committed against the Skopps, defendants George Momon and Alfred Ford were found guilty of count 5, robbery (§ 211), with a finding that both personally used a handgun (§ 12022.5), and that both did personally inflict great bodily injury upon Joseph Skopp (§ 12022.7).

Momon and Alfred Ford were also found guilty of count 6, first degree burglary (§ 459), with findings of personal firearm use (§ 12022.5), and personal infliction of great bodily injury (§ 12022.7).

Momon was also found guilty of count 7, assault with the intent to commit rape (§ 220), with a finding of personal use of a firearm (§ 12022.5).[3]

*Victims Brosi (counts 9, 10 and 11)*

The weekend before December 1, 1980, 68-year-old Lucille Brosi went shopping at a supermarket. She was wearing over $9,000 in jewelry, including a $7,000 diamond ring and an item made from a $2½ gold piece. As she drove home she spotted two men following her in a brown car whom she had noticed looking at her while she was in the store.

When she turned into her carport she noticed their car pass on by but when she got out of her car she spotted four legs under a bush near her porch. Two men approached her and one of them was having difficulty

---

[3]The firearm enhancement was not reported on the abstract of judgment.

speaking and she could not make out intelligible sounds as he tried to talk to her. She screamed for her 67-year-old husband and when he approached the men ran to their car which had been parked in front of a neighbor's house and drove away. On that date Alfred Ford's jaws were "wired up" due to a broken jaw.

That same weekend the state's main witness, a crime partner of defendants who turned state's evidence named Alvin Scott, testified he saw Momon and Alfred Ford parked near the Brosi's residence in Momon's brown car.

At 4:30 in the morning on Monday, December 1, 1980, three men burst into the Brosi's bedroom, yelling, "We are going to kill you," and "Where is that diamond?" Mr. Brosi reached for his pearl-handled gun but the robbers beat him to it and began beating him with a pistol. One of the assailants held a flashlight and as he beat Mr. Brosi the light illuminated the assailant's face. Mrs. Brosi identified this man as Momon. Mr. Brosi was pistol-whipped so severely that he was hospitalized for two weeks and lost the sight in one eye. Mrs. Brosi also was beaten and suffered a broken hand. The robbers took the jewelry including the $2½ gold piece.

Mrs. Brosi identified Momon at a lineup but did not identify Alfred Ford in the lineup. She subsequently did identify Alfred Ford at trial.

On December 2, 1980, a jewelry store owner in Fresno bought from Alfred Ford, Alvin Scott and another, jewelry which included the $2½ gold piece. That same day Alfred Ford described a gun to Alvin Scott and said he would give it him. It was a silver-plated, pearl-handled .38 that "broke down" to load.

In connection with the crimes against the Brosis, Momon and Alfred Ford were convicted of count 9, robbery (§ 211), with findings that each was armed with a handgun (§ 12022, subd. (a)). The jury also found that Momon personally inflicted great bodily injury (§ 12022.7) on both Tony and Lucille Brosi.

Momon and Alfred Ford were also found guilty of count 10, first degree burglary (§ 459), with findings that each was armed with a handgun (§ 12022, subd. (a)). In connection with Momon, there were also findings of personal infliction of great bodily injury (§ 12022.7) on Tony and Lucille Brosi.

Alfred Ford was found guilty of assault with a deadly weapon (§ 245, subd. (a)), which was a lesser included offense of count 11. Momon was

also found guilty of count 11, assault with intent to commit murder (§ 217), with a finding of personal use of a handgun (§ 12022.5).

The defendants were sentenced to prison with appropriate credits: 7 years for Tony Ford, 13 1/2 years for Alfred Ford, and 19 years for Momon.

## II. In-Court Identifications of Alfred Ford[4]

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## X. Validity of Search Warrant

Pursuant to a search warrant, the Ford residence was searched, netting items taken during the Skopp robbery. At the time of the search, Momon was found at the Ford apartment. The items seized were introduced into evidence at trial, and the two defendants found guilty of crimes relating to the Skopp burglary, Alfred Ford and George Momon, contend that their motions to suppress should have been granted on the ground that the search warrant was invalid. This requires an examination of a number of subsidiary issues.

### A. Facts

At the de novo suppression hearing,[7] the only testimony of significance was that of Detective Robert Johansen. We present a summary in the form of a chronology:

*December 2, 1980*

Detective Johansen was investigating the robbery of Diana Cubre.[8] He learned that just prior to the crime she had patronized a grocery store. A clerk there reported that two male blacks had been in the store acting "extremely suspiciously" and had appeared interested in an elderly female patron of the store. One of them was seen in a described pickup.

Based upon this information, Johansen issued a "be on the lookout for" memorandum instructing patrol deputies to detain certain suspects if seen in the described vehicle.

---

[4]See footnote 1, *ante*.

[7]The defendants refused to stipulate that any part of the preliminary hearing testimony could be considered.

[8]The charges concerning the Cubre robbery were severed and are not a subject of this appeal.

*December 3-4, 1980*

A confidential informant,[9] who had agreed to provide information about certain armed robberies and burglaries in exchange for having pending charges of burglary and receiving stolen property (separate incidents) against him dropped, stated to Johansen that he had been present with Alfred Ford, Anthony Ford and Alvin Scott when the three discussed various armed robberies they had committed in north Fresno. The confidential informant described robberies in which the Fords and Scott followed the victims home from grocery stores and either attacked them immediately or returned in the early morning hours and attacked the victims as they slept. Johansen was able to correlate the information given by the confidential informant as to the robberies (which was so detailed that it must have come from a participant) with police reports relating to various armed robberies that had been committed in the north Fresno area. The confidential informant described items of stolen property he had seen in the Fords' apartment, and drove around Fresno with Johansen pointing out the Ford apartment on South Callisch; he also identified a residence where the Fords had purchased cocaine, the place where the Fords had fenced stolen property, and the former residence of Alvin Scott.

Pursuant to the "be on the lookout for" memorandum issued December 2, Alvin Scott was stopped while driving his pickup shortly before 11:30 p.m. on December 3. Johansen arrived at the scene at 11:30 p.m. Scott was in the back seat of a patrol car, handcuffed. Johansen told Scott that he (Scott) was being detained for investigation of armed robbery and attempted murder, and advised him of his constitutional rights. He advised Scott that he wanted to take him down to his office. Johansen testified that he did not arrest him at that time. Scott said, "You goddamn rights [*sic*] I want to go with you. I didn't commit no robberies." Scott was transported to Johansen's office, where Johansen told him (Scott) that he had been identified by the grocery store clerk in connection with the Cubre robbery, that he would be viewed by that clerk in a lineup, and that the victim, Ms. Cubre, would need plastic surgery as the result of the attack.

In the initial interrogation, Scott told Johansen an exculpatory version of events in which he (Scott) was an unwilling participant in the Cubre robbery, merely driving to various locations at the behest of Alfred Ford and "Crazy George" (defendant Momon). Johansen sent Scott to be booked, knowing this would occupy him for some time, and immediately went to see Scott's girl friend, Charlene Powell, who echoed Scott's exculpatory, nonparticipatory version of the Cubre robbery.

---

[9]The informant was revealed during the suppression hearing to be Tony Asberry.

*December 4-8, 1980*

During a subsequent interrogation, which probably occurred on December 5, 1980, Scott was granted immunity and then admitted that he had participated in the Cubre robbery, and apparently related details of other robberies he had either participated in or overheard the defendants talking about having committed. Scott stated that he had seen stolen items of silver at the Fords' apartment on South Callisch, and had seen stolen furs at the Fords' previous apartment (Johansen testified that he understood Scott to mean the South Callisch apartment at the time the furs were mentioned). Scott told Johansen that the Fords had cheated him (Scott) out of some of the proceeds of the robberies, amounting to several thousand dollars. Everything Scott told Johansen about robberies could be related to a police record of a reported robbery. Scott also told Johansen that the Fords had beaten Tony Asberry (whom Scott was unaware was a confidential informant in the same case) because they felt that he (Asberry) had stolen from them. After all interviews were over, Scott asked Johansen to have him (Scott), his girl friend and her child transported out of state as part of the deal in exchange for his testimony.

Sometime during the period from December 4 to December 8, 1980, the grocery store clerk who had originally described the two "suspicious" black males viewed a photograph of Scott and identified him as one of the two males.

*December 8, 1980*

Johansen went to the magistrate's home about 8 p.m. on December 8, 1980. He had begun preparing the affidavit that same day about 4 p.m. Johansen testified that this was the first affidavit for a search warrant he had ever prepared, and he did not know "how much of a book [he] had to write." He did not include in the affidavit the fact that both the confidential informant and Scott had been offered deals in which pending charges were dropped and immunity for uncharged crimes was granted in exchange for the information they supplied. An additional reason why Johansen did not include this information was because he did not know what "use and transactional immunity" meant. Johansen did not feel that these facts were of major import, and, in an unsworn, unrecorded conversation had before the search warrant was issued, he told the magistrate about the two deals. Johansen did not include in the affidavit the fact that Scott had asked to be transported to another state because he (Scott) had withdrawn this request by the time the affidavit was being prepared. The fact that Scott had said that the Fords had deprived him of several thousand dollars worth of loot was not included in the affidavit because Johansen felt that Scott had evened

things out by stealing a ring from the Fords. Johansen did not feel it was necessary to include the fact that the Fords had beaten the confidential informant and accused him (the confidential informant) of stealing from them.

## B. Trial Court's Rulings

After hearing the testimony and argument from counsel the trial court ruled as follows:

1) Alvin Scott's information, as related by Johansen in the search warrant affidavit, could properly be considered by the magistrate because:

a) Johansen had probable cause to arrest Scott, based upon the information from the confidential informant and from the grocery store clerk, at the time Scott was arrested.

b) Scott's decision to cooperate was motivated by his desire to prevent or avoid further incidents (like the Cubre robbery) which were likely to result in the death of a victim.

c) The court did not make a finding as to whether Scott was arrested or merely detained while sitting handcuffed in the patrol car awaiting the arrival of Detective Johansen. Nor did the court make an express finding as to whether Scott's assent to talk was a submission to authority. The court stated: "the Court finds that Scott did say within a few minutes after he was stopped that he wanted to talk to Officer Johansen. This may well control the issue of the admissibility of Scott's testimony. But even if it doesn't, the Court's decision is based on two alternative grounds."

2) Issuance of the search warrant was supported by probable cause.

a) Scott made statements adverse to his interest before being offered immunity.

b) The statements of Scott and the confidential informant were corroborated by each other and by information received from Charlene Powell, from the grocery clerk, and from a witness who saw Alfred Ford's car parked outside one of the victims' residence at about the time a robbery occurred.

3) Officer Johansen had no intent to mislead the magistrate and the magistrate was not misled.

a) The deals given Scott and the confidential informant in exchange for their testimony and information were not material, since neither was pre-

sented as anything other than a criminal informant, and since they corroborated each other.

All motions to suppress were denied.

### C. Was Scott Legally Detained?

██ Presumably because the trial court made no finding as to whether Scott was arrested or detained at the scene of the stop, and because there was no contention below that when Scott assented to going to the police station and talking, his consent was the result of a submission to authority, both parties' primary argument centers on whether Scott was illegally detained when his pickup truck was stopped by the officers and he was held for Detective Johansen.

By the time he got to the situs of the stop, Johansen had probable cause to arrest based upon the information given by the confidential informant. However, he did not have probable cause when he issued the "be on the lookout for" memorandum.[10]

This case poses an issue which is apparently of first impression. In assessing probable cause to detain, are the People restricted to the state of police information on the date the "be on the lookout for" memorandum was issued on December 2, 1980? Or may the People utilize additional information obtained by the officer after he had issued the "be on the lookout for" memorandum but before the stop?

In *Whiteley* v. *Warden* (1971) 401 U.S. 560 [28 L.Ed.2d 306, 91 S.Ct. 1031], an arrest warrant was issued without probable cause. The warrant information was transmitted over a statewide radio network and received by a sheriff in another county who arrested the defendant. An ensuing search revealed several items introduced into evidence at trial. In a habeas corpus proceeding, the Supreme Court held that the invalidity of the warrant rendered the arrest illegal. 1 LaFave, Search and Seizure (1978) section 3.5(b), pages 629-630, explains that the rule is based on the fact that otherwise the placing of a warrant in a telecommunications network would permit seizures without probable cause.

California law is in accord. While officers in the field may act upon information furnished through official channels, when the totality of police conduct must be justified, the People must show the basis for the originating

---

[10]All the officer had was that two black males were in a grocery store frequented by whites, acted suspiciously and appeared interested in an elderly female patron.

officer's information. (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11].) The People must show that an officer who initiated a request which prompted another officer to make an arrest had probable cause to believe that the arrestee had committed a felony. (*People* v. *Lara* (1967) 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202].)

■ Police officers may not manufacture reasonable grounds for arrest within a police department. (*People* v. *Harvey* (1958) 156 Cal.App.2d 516, 523 [319 P.2d 689]; and see *People* v. *Madden* (1970) 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971].)

The *Whiteley* court touched upon the possibility of the originating officer securing additional corroborative data after he has issued the directive to stop a defendant in footnote 12, page 568 [28 L.Ed.2d at page 313] (*Whiteley* v. *Warden, supra,* 401 U.S. 560).[11] Thorough research of California and other state and federal cases has failed to reveal any decision which has discussed this footnote in a pertinent manner.

■ It is well established that where an officer makes an arrest without a directive or request from another officer or agency, he may not justify the arrest on the existence of probable cause in the hands of the other officer or agency. Thus, in *Salter* v. *State* (1975) 163 Ind.App. 35 [321 N.E.2d 760] one officer had probable cause to arrest, another actually arrested and a search incident to the arrest netted heroin. There had been no communication between the officers. The court held the arrest illegal because of the absence of evidence of such a communication. This case is cited with approval in 1 LaFave, *supra,* section 3.5(c), pages 631-632.

■ In the instant case, there was communication, but the communication was made at a time when Detective Johansen did not have sufficient facts to establish probable cause.

There is language in the cases which indicates that a court may impute to the arresting officer the collective knowledge of law enforcement agencies for the purpose of establishing probable cause. (See, e.g., *People* v. *Ramirez* (1983) 34 Cal.3d 541, 547 [194 Cal.Rptr. 454, 668 P.2d 761].) However, with the limited exception noted below, in each case we have found, there has been the requirement that there must exist *in one place*

---

[11]The footnote states: "The arrest warrant issued at about noon on November 24, 1964. See App. 53. State bulletin 881 was broadcast at 3:03 p.m. that same day. App. 31. It is apparent that Sheriff Ogburn did not himself acquire additional corroborative data possibly supporting a probable-cause arrest after securing the warrant."

sufficient information to constitute probable cause. That place then initiates the directive relied upon by the officer in the field who makes the stop.

Those requirements were met in *People* v. *Beard* (1976) 35 Ill.App. 725 [342 N.E.2d 343]. The defendants, convicted of theft, contended on appeal that their motion to suppress should have been granted. After receiving information that two black men were trying to exchange silver coins for currency, the police broadcast an order to stop the car in which they were driving. This was at 11 a.m. At 11:45 an officer investigating a burglary radioed in that coins had been taken during the burglary and there might be a connection between the burglary and the attempt to cash in the silver coins.

Shortly thereafter, another officer, Harmon, who had not heard of the burglary, commenced following the defendant's car in response to the 11 a.m. radio broadcast. He was in an unmarked vehicle, and asked for a backup. An assisting officer in a marked car fell in behind the defendant's vehicle and made the stop.

The trial court denied the motion to quash, which was affirmed. Although the arresting officers did not know of the burglary at the time they made the stop, the investigating officer did and had communicated that fact to headquarters. Subsequent to receiving that information, headquarters notified the officer in the marked car to assist. Thus, the previous stop order was confirmed by the directive to the officer in his squad car. The fact that Officer Harmon did not have all of the information in the hands of the investigating officer was not fatal because headquarters did and confirmed the earlier stop order by asking the officer in the squad car to assist in the stop. Therefore, even though there was not probable cause to detain at the time of the 11 a.m. broadcast, there was at the time of the directive to assist in the stop and that cured any deficiency. (*Beard, supra,* at p. 348.)

It is to be noted that in *Beard,* there was a second directive which was sent out after there was probable cause, and that directive was acted upon in effecting the stop.

To the requirement that there exist in one place sufficient information to constitute probable cause, there is an exception established in a well considered line of cases holding that if the officers are working together as a closely coordinated team, the collective knowledge of all of the officers may be utilized in determining probable cause. (See, for example, *U.S.* v. *Nieto* (5th Cir. 1975) 510 F.2d 1118, 1120; *United States* v. *Lomas* (9th Cir. 1983) 706 F.2d 886, 892; *State* v. *Maesse* (1981) 29 Wn.App. 642 [629 P.2d 1349].)

However, California has not adopted the doctrine that the collective information of law enforcement officers working together as a closely coordinated team is sufficient to establish probable cause. Thus, in *People* v. *Coleman* (1968) 258 Cal.App.2d 560 [65 Cal.Rptr. 732], two highway patrolmen observed a vehicle moving erratically, and when they pulled the vehicle to the side of the road, one officer noticed furtive activity among the occupants. (*Id.,* at pp. 561-562.) The other officer was told by one occupant that the defendant (another occupant) possessed marijuana, so he searched the defendant. (*Id.,* at p. 562.) The Court of Appeal held that the information possessed by the latter officer did not justify the search, and further noted: "The evidence does not disclose that [the searching officer] observed the furtive movement testified to by [the other officer], and since [the searching officer] apparently was the driver of the police car, it is reasonable to assume that his attention on other duties as a driver made it unlikely that he had observed such movement. In the absence of evidence that he had so observed, we do not attribute that fact to his knowledge. Had the total knowledge of both officers been possessed by [the searching officer] at the time of the search, probable cause would have existed. [Citation.] The police cannot pool their information after an arrest made on insufficient cause." (*Id.,* at p. 563, fn. 2.)

Another application of the same concept is found in *State* v. *Mickelson* (1974) 18 Ore.App. 647 [526 P.2d 583]. Several officers were searching an apartment pursuant to a search warrant. The defendant was not named in the search warrant and the apartment belonged to another. The defendant and others were held in the living room during the search. Deputy Chaney searched the rear bedroom and found items of personal property belonging to defendant. Sergeant Johnson, not knowing of this latter find, searched defendant's purse and found amphetamine tablets. The trial court granted a motion to quash and the People appealed. The appellate panel affirmed, stating at page 584:

"To conclude that circumstances constituting probable cause existed, however, is not dispositive here. Sergeant Johnson did not have knowledge of Deputy Chaney's discovery of the hashish oil in the rear bedroom at the time he searched defendant and Deputy Chaney's knowledge cannot be imputed to him. To hold the search in this case justified would encourage police officers to search on the hope that the total knowledge of all those officers involved in a case will later be found to constitute probable cause if the search is challenged. We think it better to require that an arresting officer reasonably believe that his fellow officers have probable cause before he arrests or searches on the basis of their knowledge.

"Our declination to impute Deputy Chaney's knowledge to Sergeant Johnson is consistent with our holding in State v. Shaw, 3 Or.App. 346, 473

P.2d 159 (1970), that probable cause to arrest must be evaluated on the basis of the collective information of the police rather than that of only the arresting officer. Cases in which courts have adhered to this principle are those where the arresting officer acted with an awareness or reasonable belief that fellow officers have information sufficient to constitute probable cause. *See,* e.g., Moreno-Vallejo v. United States, 414 F.2d 901 (5 Cir. 1969), cert. den., 400 U.S. 841 . . .; United States v. Pitt, 382 F.2d 322 (4 Cir. 1967); Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966), cert. den., 386 U.S. 1008 . . . . These courts recognize that effective law enforcement often requires police officers to work as a single unit. A police officer working in a team or in a modern police organization is entitled reasonably to arrest or search on the command or summary information of another officer. But somewhere in joint police action there must be a nexus between the probable cause and invasion of privacy, between the justification and the act.

"We conclude, therefore, that the discovery by Deputy Chaney of defendant's personal property in the same room as the hashish oil, unknown to Sergeant Johnson, did not constitute probable cause for Sergeant Johnson to arrest and search the defendant." (Fn. omitted.)

There is a strong policy argument against a rule which would permit police to initiate an arrest and then justify the arrest by information in police hands at the time of the arrest, rather than at the time of the directive to arrest or detain. To hold the arrest or detention justified would encourage police officers to issue "be on the lookout for" memorandums or other directives to arrest on the hope that additional knowledge will be gained which, together with the information at hand, will constitute probable cause. (See generally *State* v. *Mickelson, supra,* 526 P.2d 583.) An argument may be made that it would be overtechnical to require Detective Johansen to withdraw his "be on the lookout for" memorandum and issue a new one when he secured facts giving him probable cause to arrest. The answer is that no societal or legitimate police purpose exists for encouraging the issuance of a "be on the lookout for" memorandum in the first place without probable cause.

We hold that an arrest made upon a directive from an officer or agency without probable cause is not validated by information obtained after the issuance of the directive but before the arrest.

### D. Scott's Statements as the Product of His Illegal Arrest

The trial court ruled that Scott's statements to Detective Johansen were not a product of the former's detention, assuming that the detention

was illegal. It must first be noted that it relied upon circumstances not established by the testimony produced at the suppression hearing, apparently relying upon its reading of the preliminary hearing transcript.[12] As noted by the court at the beginning of the suppression hearing, since the parties did not so stipulate, the preliminary hearing transcript was not admissible in the proceedings relating to the motions to suppress. (*Wilder* v. *Superior Court* (1979) 92 Cal.App.3d 90, 94 [154 Cal.Rptr. 494].) Since the evidence relied upon by the trial court to support its conclusion was not properly before that court, it must be determined whether the record contains other evidence which could justify the trial court's ruling.

Two cases have recently considered the relationship of illegal police conduct to ultimate testimony of a criminal suspect not a defendant who agrees to assist the prosecution of his former associates—*People* v. *Superior Court* (*Sosa*) (1982) 31 Cal.3d 883 [185 Cal.Rptr. 113, 649 P.2d 696] and *People* v. *Superior Court* (*Sosa*) (1983) 145 Cal.App.3d 581 [194 Cal.Rptr. 525]. Both related to the same defendant, charged with a Sacramento murder in one prosecution (*Sosa, supra,* 31 Cal.3d 883) and a Fresno murder in the other (*Sosa, supra,* 145 Cal.App.3d 581).

In the Supreme Court case, the police arrested a suspect and, through coercive methods, obtained his cooperation in their investigation, subsequently learning of the involvement in the murder of another suspect, Gonzales. (*Sosa, supra,* 31 Cal.3d at pp. 887-890.) Using additional coercive behavior, the police persuaded Gonzales to assist in prosecuting his former associates. (*Id.,* at pp. 890-891.) The trial court suppressed Gonzales' testimony, and the Supreme Court affirmed, holding that Gonzales' actions had not been voluntary. (*Id.,* at p. 892.) In response to the People's argument that the exclusionary rule should not be applied as readily to the testimony of a live witness as it is to physical evidence, the Supreme Court interpreted federal precedent[13] as establishing a two-element analysis for such Fourth

---

[12]"[The Court:] The alternative ground for the Court's decision is that Scott's statements made to Johansen were not made as a result of his arrest or detention, but rather from his independent election to testify or give information after he saw the photograph of the victim Cubre which was shown to him by Officer Johansen. His decision to tell what he knew about the defendants' activities was motivated by his desire to prevent or avoid further incidents of the same kind which were likely to result in the death of a victim.

"If there were any taint from an illegal arrest or detention, which I believe there was not, it was dissipated by Scott's eagerness to prevent a fatal injury. And it's established law that the but for test does not apply where the evidence was obtained as a result of an independent intervening act of the witness. And that's what the Court finds there was here."

As indicated above, Scott did not testify at the suppression hearing and Detective Johansen's testimony regarding Scott's cooperation did not include any incident involving the showing of a photograph of victim Cubre to Scott or any testimony about Scott's motives for cooperating with the police.

[13]*United States* v. *Ceccolini* (1978) 435 U.S. 268 [55 L.Ed.2d 268, 98 S.Ct. 1054].

Amendment situations: consideration of (1) the degree of free will exercised by the witness, and (2) the closeness and directness of the connection between the illegal police conduct and the testimony sought to be suppressed. (*Sosa, supra,* 31 Cal.3d at p. 893.) Both elements militated against the finding of attenuation—witness Gonzales was a suspect who had been coerced into cooperation, and the police conduct had been flagrantly illegal. (*Id.,* at p. 894.)

The Court of Appeal case came out of this district. It involved a different murder and a different suspect/witness (Hernandez, who had been implicated by Gonzales after the latter agreed to cooperate with the police); the same two-element analysis was applied. Hernandez, the witness, had been the subject of colorable police conduct, but had been released from prison and had gone to live in Mexico when on his own volition he recontacted the police and volunteered information as to which he subsequently testified in court proceedings. (*Sosa, supra,* 145 Cal.App.3d 581, 586-587.) We held that one element of the live witness/Fourth Amendment analysis justified a finding that any taint from the initial police conduct had been attenuated, and that the other element was vitiated: (1) the witness had voluntarily returned to Fresno from Mexico after having been released from police custody, indicating an unmistakable act of free will, and (2) although the police conduct in the Sacramento prosecution had been flagrant, the Fresno authorities had conducted themselves with constitutional propriety, and Hernandez' testimony related to an entirely separate prosecution than the one in which the illegal police behavior had taken place. (*Id.,* at pp. 587-590.)

■ In the present case, the police conduct was much less objectionable than that in the original *Sosa* prosecution, there being no evidence that Johansen was acting in bad faith when he issued the "be on the lookout for" memorandum for Scott's detention. However, there is also less evidence of free will on the part of Scott than there was in the Fresno *Sosa* prosecution—Scott was illegally arrested, immediately interrogated, and only after a grant of complete immunity for all crimes did he truthfully admit his participation in the series of armed robberies and agreed to be a prosecution witness.

We must examine whether Scott's statement, "You goddamn rights [*sic*] I want to go with you. I didn't commit no robberies," was a manifestation of free will. ■ At the time the statement was made, Scott was sitting handcuffed in the back of a patrol car after having been stopped on a public street. This is a significant intrusion, requiring probable cause. (*Dunaway* v. *New York* (1979) 442 U.S. 200 [60 L.Ed.2d 824, 99 S.Ct. 2248].) It was the functional equivalent of an arrest. (*Id.,* at pp. 213-216 [60 L.Ed.2d at pp. 836-838].) ■ Since Scott was illegally arrested, the prosecution bears the burden of demonstrating that a subsequent confession was not

obtained by exploitation of the illegal arrest. (*In re Jorge S.* (1977) 74 Cal.App.3d 852, 858-860 [141 Cal.Rptr. 722].) ▮ Whether a confession obtained after an illegal arrest is nevertheless admissible " '. . . must be answered on the facts of each case. . . . *Miranda* warnings are an important factor . . . [b]ut . . . are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant . . . .' " (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 898 [135 Cal.Rptr. 786, 558 P.2d 872], quoting from *Brown* v. *Illinois* (1975) 422 U.S. 590, 603-604 [45 L.Ed.2d 416, 427, 95 S.Ct. 2254].)

▮ In the present case, the initial interrogation immediately followed the arrest. Scott gave an exculpatory statement, so Johansen had Scott booked while he talked to Scott's girl friend. Following booking, there were three more interviews in close temporal proximity to the first, wherein Johansen obtained Scott's full confession in return for a grant of immunity. The record shows no intervening attenuating circumstances except Scott's statement that he wanted to talk. Since Scott's decision to cooperate followed closely and directly from the illegal police conduct, and there was no significant showing of any act of free will on his part, his statement and the information he supplied must be considered a product of the illegal activity. ▮▮ Since the information supplied by Scott was illegally obtained, it cannot permissibly support the issuance of a search warrant, and the affidavit submitted to obtain the search warrant is normally retested after the illegally obtained information is excised. (*People* v. *Hill* (1974) 12 Cal.3d 731, 761 [117 Cal.Rptr. 393, 528 P.2d 1].) There is a problem in this case, however, because of the defense contention that there were intentional misstatements and omissions in the affidavit.

E. Intentional Misstatements or Omissions in Affidavit[14]

. . . . . . . . . . . . . . . . . . . . . . . . .

XIV. Conclusion

The judgment is affirmed.

Brown (G. A.), P. J., and Bradstreet, J.,* concurred.

The petition of appellant Momon in No. 5807 for a hearing by the Supreme Court was denied March 21, 1984.

---

[14]See footnote 1, *ante.*

*Assigned by the Chairperson of the Judicial Council.